Alfa Mutual Fire Insurance Company ("Alfa") issued Tracie F. Payton a policy of insurance entitled "Standard Fire Policy." More than two years after issuing the policy, Alfa declined coverage for a claim for water damage caused by an air conditioner. Payton sued Alfa, seeking compensatory and punitive damages for fraudulent misrepresentation and suppression relating to the sale of the policy. The case proceeded to trial. The trial court denied Alfa's preverdict motion for a judgment as a matter of law ("JML") and submitted Payton's claims to the jury. The jury returned a verdict in favor of Payton, awarding her $80,000 in compensatory damages and $80,000 in punitive damages. The trial court entered a judgment based on the verdict. Thereafter, the trial court denied Alfa's postjudgment motion for a JML or for a remittitur; it did, however, *Page 1239 
grant Alfa's postjudgment motion for a new trial, on the basis of juror misconduct. Alfa appealed and Payton crossappealed.
The Court of Civil Appeals affirmed the trial court's denial of Alfa's postjudgment motion for a JML, but reversed the trial court's order granting the new trial. See Alfa Mut. Fire Ins. Co.v. Payton, [Ms. 2960518, October 10, 1997] 742 So.2d 1228
(Ala.Civ.App. 1997). We granted Alfa's petition for certiorari review.
 I. Facts
In May 1992, Payton applied for a Farmers Home Administration ("FmHA") loan for the construction of a new home. Melissa Williams, one of the FmHA agents working with Payton, testified that she told Payton that FmHA required its loan recipients to have fire insurance with extended coverage sufficient to cover the amount of their loans. Williams further testified that she told Payton, "[W]ith your contents you have to ask for homeowner's." FmHA agents Williams and McAlpine referred Payton to Alfa agent Gordon Ward. Before closing the loan in June 1992, Payton went to Ward's office to purchase the insurance. Payton says that she informed Ward that she was closing her loan with FmHA and that she needed insurance. Payton testified that when she got to Ward's office, she could not remember the kind of insurance the FmHA agent had recommended, but that she told Ward she wanted to purchase a policy "that covers everything."
According to Ward, Payton stated that she wanted insurance to cover the amount of her FmHA loan. It is undisputed that before June 1992 Payton had never purchased insurance; this fact was known to Ward. Ward stated that he thereupon informed Payton of the different coverages available and then sold her an "SF-1" version of a standard fire policy. During his testimony, Ward explained that there are three versions of the standard fire policy. The SF-1 version is the least expensive and the most restrictive; it is commonly referred to as a builder's risk policy; it covers damage from certain perils that may cause harm during the construction phase, e.g., fire, lightning, windstorm or hail, explosion, riot or civil commotion, damage by aircraft or vehicles, and smoke; it does not include "contents coverage." The SF-2 and SF-3 are broader versions of the SF-1. According to Ward, he explained to Payton at the time of the sale that a builder's risk policy was suitable for a home while it was under construction and that once Payton moved in she could add contents coverage or purchase a homeowner's policy. Payton admits that Ward went over some papers with her and that he showed her a policy. She testified, however, that she did not then understand what Ward was talking about. Payton did not inform Ward that she did not understand what he was talking about as he gave his explanation.
Ward completed, and Payton signed, an "Application for Fire Insurance," which described the coverage as "builder's risk." Payton stated that she trusted Ward and for that reason did not read the application before she signed it. Payton further stated that even if she had read the application, she would not have understood that the standard fire policy did not "cover everything." There is no evidence that at the time she signed the application Payton reiterated her request for a policy that "covers everything." Approximately one month later, Payton received a copy of her policy, entitled "Standard Fire Policy." Payton admitted that she did not read the policy, but she testified that even if she had read it she would not have understood it. After receiving her policy, Payton never contacted Ward for assistance in understanding it.
Ward and Payton had a second meeting several months later. Ward testified that in March 1993 he inspected Payton's home to verify completion of the construction and that, upon seeing the furniture in the house, he once again informed Payton that she could add contents coverage or that she could change to a homeowner's policy. *Page 1240 
Payton admitted that Ward had visited her home and, although she first denied discussing insurance, she later acknowledged that he discussed insurance with her and, she said, while she did not recall the specifics, she elected not to purchase any more insurance at the time. Payton also testified that she did not think Ward had ever made any untrue statements to her.
In June 1994, Payton's air conditioner leaked water, causing damage to the interior of her home, including its contents. Alfa refused to pay the claim for the loss, because accidental overflow of water was not a covered peril under Payton's policy.[1]
 II. Standard of review
When reviewing a ruling on a motion for a JML, this Court uses the same standard the trial court used initially in granting or denying the motion. Palm Harbor Homes, Inc. v. Crawford,689 So.2d 3 (Ala. 1997). Regarding questions of fact, the ultimate issue is whether the nonmovant has presented sufficient evidence to allow the case or issue to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala. 1992). In an action filed after June 11, 1987, the nonmovant must present substantial evidence to withstand a motion for a JML. See § 12-21-12, Ala. Code 1975; West v. Founders Life Assurance Co.of Florida, 547 So.2d 870, 871 (Ala. 1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw.Id. If the question is one of law, this Court indulges no presumption of correctness as to the trial court's ruling.Ricwil, Inc. v. S.L. Pappas Co., 599 So.2d 1126 (Ala. 1992).
 III. Sufficiency of the evidence — fraud and suppression
Alfa contends that it is entitled to a JML because, it says, Payton failed to present sufficient evidence on her claims of fraud and suppression and that failure precluded submission of those claims to the jury. In order to withstand a motion for a JML against her claim alleging fraudulent misrepresentation, Payton was required to present substantial evidence "(1) that [Ward] misrepresented a material fact; (2) that [Ward] did so willfully to deceive, recklessly without knowledge, or mistakenly; (3) that [Payton] relied on the misrepresentation . . .; and (4) that [Payton was] caused damage as a proximate consequence of [her] reliance." Life Ins. Co. of Georgia v. Parker,706 So.2d 1108, 1113 (Ala. 1997) (footnote omitted); Ala. Code 1975, §6-5-101.
The trial court's pretrial order states that Payton specifically alleged that Ward fraudulently represented to her that she was purchasing a homeowner's insurance policy with complete coverage, including contents coverage. At trial, Payton failed to present evidence of any affirmative misrepresentations that Ward actually made, i.e., Payton did not allege that Ward represented that he was selling her a homeowner's policy, that she had full coverage, or that she had contents coverage. Instead, Payton repeatedly testified that she could not even recall the kind of insurance Ward discussed with her. In fact, as previously noted, Payton candidly admitted that she did not think Ward had made any statements to her that were untrue. Clearly, Payton's testimony illustrates the absence of proof of the essential element of a misrepresentation of a material fact. Parker. *Page 1241 
We now turn to the question whether Payton presented sufficient evidence to warrant submitting her suppression claim to the jury. Payton "may show that [Ward's] failure to disclose, or suppression of, a material fact, rather than an affirmative misrepresentation, induced the reliance and proximately caused the damage." Booker v. United American Ins. Co., 700 So.2d 1333,1338 (Ala. 1997); Ala. Code 1975, § 6-5-102. The trial court's pretrial order states that Payton alleged that Ward suppressed the fact that she was purchasing a policy that provided less than complete coverage, i.e., suppressed the fact that the policy excluded coverage for damage to the contents of her home.
A careful review of Payton's testimony at trial reveals a great deal of confusion on her part when she was recalling her conversation with Ward. In order to clarify parts of Payton's testimony, counsel for Alfa, on cross-examination, repeatedly referred Payton to certain portions of her deposition:
 "Q. [reading from deposition]: "`On June 2, 1992, did you go over and see Mr. Gordon Ward and tell him you wanted insurance that covered everything?
"`Yes, sir.
"`Did you tell him anything else?
"`No.'
 "Q. I had asked you about whether you had told him about contents or anything.
"A. I didn't say anything about contents.
". . . .
 "Q. [reading from deposition]: "`Do you recall any conversation you had with Mr. Ward on June 2, 1992?
"`No, I can't recall right now.
 "`What did Mr. Ward say when you told him that you wanted insurance that covered everything?
 "`When I told him I wanted insurance that covered everything, he just got out a policy. And, by me not being an insurance representative, I didn't know, so I just told him I wanted insurance that covered everything from day one.'
"`. . . .
 "Q. `[H]e just got out a policy.' Let me ask you this. I think I went over this yesterday. Do you recall signing an application for insurance in Mr. Ward's office, did you not?
"A. Yes, sir.
 "Q. I'm going to refer you to what has been identified as . . . Exhibit 5. And, I want to ask you, first of all, does your name appear anywhere on this document?
"A. Yes.
". . . .
"Q. And, what date is that signed?
"A. June — June the 2d.
 "Q. . . . Now, would that have been a document that Mr. Ward discussed with you or reviewed with you in his office when you went over there?
"A. I guess.
". . . .
 "Q. My question was, did he talk to you about that document at all?
"A. I think so.
 "Q. Can you — at the very top of that document, can you read that for me?
 "A. `Application for fire insurance, Alfa Mutual Fire Insurance.'
". . . .
 "Q. Listen to my question. . . . If you had seen that documentand that title, the day that you were in Mr. Ward's office, would you not have known that that was fire insurance?
"A. No, I don't think so.
"Q. Why?
". . . .
"A. I don't know that I paid any attention.
 "Q. All right. Also down here is an area circled . . . `builder's risk.' Do you recall seeing that? *Page 1242 
"A. No. I didn't fill that out.
 "Q. I understand that, but did Mr. Ward mention that to you?
"A. I don't recall.
". . . .
 "Q. And, wouldn't it stand to reason that he told you about the rest of the contents of the policy?
"A. He might. I don't think so.
". . . .
 "Q. Let me show you this document. Here's to your same day property insurance with Alfa [sic]. Do you recall ever seeing that document?
"A. Yes, I do.
". . . .
 "Q. And, on that document it is also checked, `Standard Fire Insurance.' Can you read that, `Standard Fire Insurance'?
"A. Yes.
 "Q. Do you recall him going over that document with you?
"A. I guess he did.
". . . .
 "Q. [reading from deposition]: "`The exact words you used to Mr. Ward were "I want insurance that covers everything from day one"?
"You said `Yes, sir.'
"`. . . .
 "`And you don't recall anything else you told him about what kind of insurance you wanted?
"`No, sir.
 "`What did Mr. Ward say to you when you told him, "I want insurance that covers everything from day one"?
"`. . . .
 "`I can't recall exactly what he did, but I do remember he just took out a policy and just — I really didn't look at it because I don't know anything about insurance. I just went on his word because I trusted him.'
 "Q. Now, so he took out something and went over it in his office, right?
"A. Yes.
 "Q. So he explained something to you while you were over there?
"A. Yes.
 "Q. And, he . . . probably explained to you about the standard fire policy?
 "A. Like I say, I'm not an insurance agent and I didn't understand.
 "Q. [reading from deposition]: "`Okay. When he took out the policy, did he begin to talk [to] you about what kind of insurance was in the policy?'
 "Answe `He just was repeating about the insurance and I didn't understand what type of insurance it was.'
"`. . . .
 "`Were you looking though at the policy while he was talking to you?
 "`I was really looking at him as he flipped pages and stuff.
"`. . . .'
"Q. Were you listening to him or what?
"A. Yeah, I was listening. I guess I was.
 "Q. [reading from deposition]: "`So the two of y'all are sitting there and he's holding the policy out in front and he's going from page to page in that policy and telling about that policy; is that correct?'
"And, you say, `Yes.'
 "Q. So he was telling you about some policy he was flipping through, wasn't he?
"A. I guess he was.
". . . .
 "Q. [reading from deposition]: "`What did he say to you when you said "I want insurance that covers everything from day one"?
 "Your answer: `I can't recall exactly what he said.'
 "Q. He had some kind of response to you when you told him that you wanted insurance that covered from day *Page 1243 
one, didn't he? He had some kind of response?
"A. I guess he did.
". . . .
 "Q. [reading from deposition]: "`Did you tell Mr. Ward that you were financing the purchase of your home through Farmers Home and that that was the reason you wanted to buy insurance?
 "`I told him I was closing my loan with Farmers Home and I needed some insurance on my house.' Is that correct?
"A. It's right there on the paper.
". . . .
 "Q. Tracie, in this suit you have represented that Mr. Ward has fraudulently done something or he has suppressed some information that you were told [sic]; is that your understanding of this suit?
 "A. My understanding is he did me wrong and I trusted him. And, I had trusted Mr. Ward and he just didn't do me right.
 "Q. Okay. Now, let me read what you said to the question, starting at line eight:
 "Q. [reading from deposition]: "`Has Mr. Ward ever made any statement to you that was not a true statement? And there's an objection.
"And, your answer is, `I don't think so.'
"Q. Is that your statement?
"A. I guess it is."
As stated by Judge Thompson, in his dissent addressed to Judge Wright's opinion for the Court of Civil Appeals, "Payton's testimony reveals her great confusion and almost total lack of recall concerning her conversation with Ward that took place when she applied to purchase the insurance." Alfa Mut. Fire Ins. Co.v. Payton, 742 So.2d at 1237 (Thompson, J., dissenting). The testimony given by Ward clearly suggests that Ward reviewed the application with Payton and that she had every opportunity to review it and the policy provisions before she signed it. Payton, on the other hand, testified that she really did not pay attention and that she really did not understand what Ward was telling her.
By reason of her then undisclosed, but now admitted, inattention and inability to understand virtually anything Ward was saying, Payton cannot contradict Ward's testimony that he disclosed the material facts concerning the limited scope of coverage, facts she now claims were concealed. Where the record indicates that the information alleged to have been suppressed was in fact disclosed, and there are no special circumstances affecting the plaintiff's capacity to comprehend, the plaintiff cannot recover for suppression. Robinson v. JMIC Life Ins. Co.,697 So.2d 461 (Ala. 1997). We cannot assume that Ward should have known of Payton's complete lack of comprehension of his explanation, from the mere fact that he knew Payton had never purchased insurance before. Payton offered no evidence to indicate that she had a diminished capacity to hear, or to understand the English language. Had she done so, Ward could reasonably have been expected to seek assistance from a third party who could advise Payton. Under these circumstances, we find no duty to go further than Ward went. See State Farm Fire Cas. Co. v. Owen, [Ms. 1961950, August 21, 1998] 729 So.2d 834 (Ala. 1998) (whether plaintiff's factual assertions, assuming they are true, give rise to a legal duty, is properly a question of law for the court). Were the rule otherwise, an insured could establish a confidential relationship giving rise to a legal duty to do more than explain the policy to the insured, merely by proving that he or she was a first-time purchaser.
We conclude that Payton failed to present substantial evidence indicating that Ward suppressed any material fact.Booker. Because Payton failed to present substantial evidence on her claims of fraudulent misrepresentation and suppression, the trial court erred in denying Alfa's motion *Page 1244 
for a JML. Accordingly, we reverse the judgment of the Court of Civil Appeals and remand the cause for an order or proceedings consistent with this opinion. We need not discuss Alfa's remaining arguments.
REVERSED AND REMANDED.
Hooper, C.J., and Houston, See, and Brown, JJ., concur.
Johnstone, J., concurs as to the claim for punitive damages and dissents as to the claim for compensatory damages.
Maddox, J., recuses himself.
[1] We note that Payton also sued Joe Wright, doing business as Joe Wright Heating and Air Conditioning. Before trial, Payton and Wright entered into a pro tanto settlement agreement and Wright was dismissed.