838 So.2d 1039 (2002)
STATE FARM FIRE AND CASUALTY COMPANY
v.
SHADY GROVE BAPTIST CHURCH.
1010018.
Supreme Court of Alabama.
June 14, 2002.
Roderick K. Nelson and Adam M. Milam of Spain & Gillon, L.L.C., Birmingham, for appellant.
Gerald D. Colvin, Jr., of Bishop, Colvin, Johnson & Kent, Birmingham; and Frank S. Buck, Birmingham, for appellee.
HARWOOD, Justice.
State Farm Fire and Casualty Company (hereinafter referred to as "State Farm") appeals from the trial court's denial of its motions for a judgment as a matter of law in regard to a breach-of-contract claim asserted against it by the Shady Grove Baptist Church (hereinafter referred to as "the Church"). We reverse and remand.
On February 2, 1998, the Church sued State Farm, seeking to recover damages on claims of breach of contract, bad faith, and fraud in regard to State Farm's denial of a claim made by the Church following the collapse of a portion of the roof on its building. The Church's complaint alleged that an insurance policy issued by State Farm provided coverage for the roof collapse *1040 but that State Farm refused to pay the claim it made based on the collapse. On February 1, 1999, State Farm filed a motion for a summary judgment with attached exhibits and a supporting brief; on February 23, 1999, it filed a supplemental brief in support of its motion. On March 4, 1999, the Church filed an opposition to State Farm's motion for a summary judgment.
On May 3, 1999, the trial court entered a summary judgment for State Farm on the Church's claims of bad faith and fraud, and certified its judgment as final pursuant to Rule 54(b), Ala. R. Civ. P.; on May 12, 1999, the Church filed a notice of appeal. On November 19, 1999, the Court of Civil Appeals affirmed the trial court's judgment without an opinion. Shady Grove Baptist Church v. State Farm Ins. Co., 789 So.2d 253 (Ala.Civ.App.1999)(table). On July 21, 2000, State Farm resubmitted its motion for a summary judgment as to the Church's breach-of-contract claim; the trial court denied that motion on November 6, 2000. The breach-of-contract claim was tried before a jury on April 9-11, 2001.
State Farm made an oral motion for a judgment as a matter of law at the close of the Church's case-in-chief; the trial court denied the motion. On April 11, 2001, at the close of all the evidence, State Farm filed a written motion for a judgment as a matter of law; the trial court denied the motion that same day. On April 13, 2001, the jury returned a verdict in favor of the Church in the amount of $128,800, and the trial court entered a judgment on the verdict, adding $31,586.03 to the judgment as interest, for a total judgment of $160,386.03.
On May 10, 2001, State Farm filed a renewed motion for a judgment as a matter of law, or, in the alternative, a motion for a new trial or for a remittitur. On August 9, 2001, the trial court denied State Farm's renewed motion for a judgment as a matter of law and motion for a new trial. However, the trial court granted the motion insofar as it requested a remittitur and reduced the amount of the judgment to $98,700 to comport with the coverage limits of the insurance policy. The court added $24,205.98 in interest, for a total judgment of $122,905.98. On September 20, 2001, State Farm filed a notice of appeal to this Court.
State Farm states the issue presented in this appeal as whether "[t]he trial court erred by denying [its] Motion for Judgment As a Matter of Law because [the Church] failed to present any evidence which was sufficient to create a question of fact whether the cause of the roof collapse at the church was covered by the policy." Our review of the denial of a motion for a judgment as a matter of law is settled.
"When reviewing a ruling on a motion for a [judgment as a matter of law], this Court uses the same standard the trial court used initially in granting or denying the motion. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala.1997). Regarding questions of fact, the ultimate issue is whether the nonmovant has presented sufficient evidence to allow the case or issue to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala.1992). In an action filed after June 11, 1987, the nonmovant must present substantial evidence to withstand a motion for a [judgment as a matter of law]. See § 12-21-12, Ala.Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a *1041 [judgment as a matter of law], this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Id. If the question is one of law, this Court indulges no presumption of correctness as to the trial court's ruling. Ricwil, Inc. v. S.L. Pappas & Co., 599 So.2d 1126 (Ala.1992)."
Ex parte Alfa Mut. Fire Ins. Co., 742 So.2d 1237, 1240 (Ala.1999)(emphasis added). Further, this Court has stated that "`[e]vidence supporting nothing more than speculation, conjecture, or a guess does not rise to the level of substantial evidence.' " McGinnis v. Jim Walter Homes, Inc., 800 So.2d 140, 145 (Ala.2001)(quoting Brushwitz v. Ezell, 757 So.2d 423, 432 (Ala.2000)).
The insurance policy at issue provides, in pertinent part:
"SECTION I
"LOSSES INSURED AND
"LOSSES NOT INSURED
". . . .
"LOSSES
"NOT INSURED
". . . .
"2. We do not insure for loss either consisting of, or directly and immediately caused by, one of more of the following:
". . . .
"p. collapse, except as provided in the Extensions of Coverage.
"But if accidental direct physical loss results at the described premises, we will pay for that resulting loss.
"3. We do not insure under any coverage for any loss consisting of one or more of the items below. Further, we do not insure for loss described in paragraphs 1. and 2. immediately above regardless of whether one or more of the following: (a) directly or indirectly cause, contribute to or aggravate the loss; or (b) occur before, at the same time, or after the loss or any other cause of the loss:
"a. conduct, acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body whether intentional, wrongful, negligent or without fault;
"b. faulty, inadequate, unsound or defective:
"(1) planning, zoning, development, surveying, siting;
"(2) design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;
"(3) materials used in repair, construction, renovation or remodeling; or
"(4) maintenance;
"of part or all of any property (including land, structures, or improvements of any kind) on or off the described premises.
"But if accidental direct physical loss results from items 3.a. and 3.b., we will pay for that resulting loss unless the resulting loss is itself one of the losses not insured in this section.
"SECTION I
"EXTENSIONS OF
"COVERAGE
"EXTENSIONS OF COVERAGE
"Subject to the terms and conditions applicable to Section I of this policy, the following Extensions of Coverage apply separately to each location scheduled in the Declarations. But the amount of insurance afforded on any one scheduled *1042 location will not be more than the limit of insurance specified in each Extension of Coverage if a limit is included in the extension.
". . . .
"4. Collapse.
"a. We will pay for any accidental direct physical loss to covered property involving collapse of a building or any part of a building caused by only one or more of the following:
"(1) any of the `Specified Causes of Loss' or breakage of building glass, only as insured against in this policy;
"(2) hidden decay;
"(3) hidden insect or vermin damage;
"(4) weight of people or personal property;
"(5) weight of rain that collects on a roof;
"(6) use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.
". . . .
"c. Collapse does not include settling, cracking, shrinking, bulging or expansion."
In a section entitled "Definitions," the policy also states:
"Each time the phrase `Specified Causes of Loss' is used in this policy, it refers to all of the following causes:
"1. fire;
"2. lightning;
"3. explosion;
"4. windstorm or hail;
"5. smoke;
"6. aircraft or vehicles;
"7. riot or civil commotion;
"8. vandalism;
"9. leakage from fire extinguishing equipment;
"10. sinkhole collapse, meaning the sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or similar rock formations but does not include the cost of filling sinkholes.
"11. volcanic action, meaning the airborne volcanic blast or airborne shock waves, lava flow, ash, dust or particulate matter resulting from the eruption of a volcano but does not include the cost of removing ash, dust or particulate matter that does not cause accidental direct physical loss to covered property.
"12. falling objects, not including loss to:
"a. personal property in the open; or
"b. the interior of a building or structure, or property inside a building or structure, unless the roof or an outside wall of the building or structure is first damaged by a falling object;
"13. weight of snow, ice or sleet;
"14. water damage, meaning accidental discharge or leakage of water or steam as the direct result of the breaking or cracking of any part of a system or appliance containing water or steam."
In Twin City Fire Ins. Co. v. Alfa Mutual Ins. Co., 817 So.2d 687 (Ala.2001), this Court observed:
"A contract of insurance, like other contracts, is governed by the general rules of contracts. Pate v. Rollison Logging Equip., Inc., 628 So.2d 337 (Ala.1993). Insurance companies are entitled to have their policy contract enforced *1043 as written. Gregory v. Western World Ins. Co., 481 So.2d 878 (Ala.1985). `Insurance contracts, like other contracts, are construed so as to give effect to the intention of the parties, and, to determine this intent, a court must examine more than an isolated sentence or term; it must read each phrase in the context of all other provisions.' Attorneys Ins. Mut. of Alabama, Inc. v. Smith, Blocker & Lowther, P.C., 703 So.2d 866, 870 (Ala.1996)."
817 So.2d at 691-92.[1]
In regard to its burden of proof under the policy, the Church states in its brief to this Court:
"Certainly Shady Grove proved that there was a collapse of the roof which is clearly a covered loss under the policy.... Further it is clear that Shady Grove established as probable causes of this collapse a number of causes listed as insured under the policy, such as explosion (blasting), weight of people, load of wind, rain, ice and snow, decayed wood and insect or vermin damage. The position of State Farm appears to be that the loss should be excluded because of State Farm's contention that defective construction played a part in the collapse. Clearly any such contention should have been considered as State Farm's burden to prove."
However, the policy states that it does not provide coverage for collapse unless the collapse resulted from one or more of the six specific enumerated causes stated within the section entitled "Extensions of Coverage."[2] Further, it is not State Farm's position on appeal that the collapse was excluded from coverage; rather, State Farm asserts that the collapse was not covered under the policy. Therefore, this is not a case in which the Church has to prove that a collapse, as defined within the policy, has occurred and State Farm then has to prove that a certain exclusion within the policy removed the collapse from the scope of its coverage. See Twin City Fire Ins. Co. v. Alfa Mut. Ins. Co., 817 So.2d at 697 ("[The insurer] has the burden of proof in asserting that a claim is excluded under its policy of insurance."). Rather, in resisting State Farm's motions for a judgment as a matter of law, and for the trial court's denial of those motions to have been proper, the Church must have submitted substantial evidence showing that the collapse fitted within the definition of that term in the policy and that it was covered under the policy by virtue of its being caused by at least one of the six enumerated causes provided in the policy. See, e.g., State Farm Fire & Cas. Co. v. Slade, 747 So.2d 293, 325-26 (Ala.1999)(considering, on rehearing, whether the insureds had presented substantial evidence showing that their loss was a collapse as that term was defined in a policy); Colonial Life & Accident Ins. Co. v. Collins, 280 Ala. 373, 376, 194 So.2d 532, 535 (1967)("The burden was on the plaintiff to prove that the insured's death *1044 resulted from injuries sustained in such a manner as to bring him within the coverage of the policy."). Accordingly, we must consider whether the Church submitted substantial evidence as to this issue. Ex parte Alfa Mut. Fire Ins. Co., McGinnis v. Jim Walter Homes, Inc., supra.
During the Church's case-in-chief, testimony was elicited from Preston Walker, a former trustee, deacon, and pastor of the Church; Joann Lewis, Walker's sister and chairman of the Church's building committee; and Timothy Ryan, a State Farm claim-team manager. Portions of the deposition testimony of Hugh Walker, Jr., deceased, the brother of Preston Walker and Lewis and a former trustee and deacon of the Church, was also read into evidence. Preston Walker, Lewis, and Hugh Walker all testified that a coal company had conducted blasting activity in close proximity to the community in which the Church's building was located; the Church alleges in its brief that the blasting constituted an "explosion," listed as a specified cause of loss in the policy.
Preston Walker testified as follows:
"Q. Well, prior to '91 when you moved away, do you ever recall there having been blasting in and around the Sipsey area?
"A. I'm trying to think of that company that came in there. There's a company came in there from Cullman. I can't recall their name, and there was a lot of strip pits back in there.
"Q. At the home that you lived in when you were in Sipsey, did you ever have occasion to experience blasting to where you could feel it in your home?
"A. You could kind of feel a rumble sometimes from it, uh-huh."
Lewis testified as follows:
"Q. Living in that Sipsey area in the year prior to the collapse of the roof of the church, did you experience any effects of blasting in the area?
"A. Well, you know, a couple of times in my lifetime, but when I moved in my house, a couple of times I rememberI think it was like on August 8 that there was some blasting done, and you know, it just like rattled the dishes, you know, no kind of effects in my house. It was just like a rattle.
"Q. But it was something you could feel and see[,] the rattle?
"A. Yeah.
"Q. And that occurred more than once in your residence?
"A. Not a lot since I've been in my house, not a lot."
The deposition testimony of Hugh Walker, which was read into evidence, stated:
"Q. Have you ever had any blasting damage at your house here in Sipsey?
"A. Not at my house.
"Q. How far do you live from the church, Shady Grove?
"A. About three or four blocks, kind of blocks.
". . . .
"Q. Did you have any damage to your house from what you thought might be blasting in the summer of 1997 [when the roof on the Church's building collapsed]?
"A. No. No, I didn't. I didn't have no damage I don't think.
"Q. Anybody around you?
"A. Well, nobodythe boy that stayed next to me, stayed down up under the hill from me, he was saying that his cabinets and things wasyou know, was shaking and going on at times.
"Q. Dishes rattling, plates rattling, things like that?
"A. Yes."
*1045 In regard to the activities conducted in the Church's building, i.e., weight of people, Lewis testified as follows:
"Q. What kind of activities did y'all have in this church building?
"A. As far as our services, you know, we had a lot of praise in our church. We have a lot of praise in our church.
"Q. Is it a spirit-filled worship?
"A. Yes.
"Q. And do people sing and sway and raise their hands and be animated in their worship of the Lord?
"A. Yes, yes.
"Q. Have you filled that church up
"A. Yes.
"Q. with people?
"A. Uh-huh.
". . . .
"Q. Do you have children in the congregation?
"A. Yes.
"Q. And before and after church, do they sometimes run around and jump and have active times within the church?
"A. Yes, but, you know, we try to refrain from a lot of kids running around in the church but there are times that that happens."
Further, in regard to weather conditions the Church's building had been exposed tothe load of wind, rain, ice, and snow Lewis testified:
"Q. Have there been occasions at your house and at the church building when there have been heavy wind and rain storms?
"A. Yes.
"Q. Have there been occasions where there have been snows and sleet?
"A. Yes.
"Q. Have there been occasions where those have piled up on the roofs of your house and of the church's house?
"A. Yes. It happens to everybody."
Lewis also made mention of possible termite damage to the roof, stating:
"Q. After this roof came in, have you had an opportunity to look at some of the wood that was in there to determine if it was all good wood or if some of it had decayed?
"A. After it happened, you know, we were like just looking around in it, none of us being skilled in the area but, you know, you could pick up pieces of wood or you could walk to areas where someone would say, well, those are termites, termites have eaten it, but as far as experts or skilled people knowing, we were just looking."
In regard to Preston Walker's belief as to a specific cause of the roof's collapse, he stated:
"Q. From what you did observe, could you come to any conclusion as to why that roof would have fallen in?
"[State Farm's counsel]: Object, Your Honor. I don't think there has been any predicate laid for him to render an opinion.
"THE COURT: Overruled. You can answer it.
"[State Farm's counsel]: Your Honor, can I take him on voir dire for qualify?
"THE COURT: Let's see what his answer is first.
"[THE COURT:] Do you have an opinion? Do you know why it fell?
"THE WITNESS: No, I don't. I was surprised.
"THE COURT: You don't have an opinion, do you?
"THE WITNESS: Not really."
*1046 As to the question of a specific cause, Hugh Walker testified in his deposition as follows:
"Q. Yes, sir. Let me ask you this: Do you have an opinion as to what happened to the church roof?
"A. No. The only thing thatthe only thing I knew is it justI don't know what happened to it. It just fell in.
"Q. Do you have an opinion as to what caused it to fall in?
"A. Old and it could have been blasting and termites. It could have been anything. I don't know. I just don't know."
The Church's final witness was Timothy Ryan, a State Farm claim-team manager, who testified as to why the Church's claim was denied. Ryan stated that the claim was denied based on an engineer's report. That report, which was admitted into evidence during Ryan's testimony, appears in the record as a 17-page document prepared by Joel D. Wehrman, identified as a registered engineer in the state of Alabama, on behalf of JADE Engineering. The report's conclusion was that the collapse of the roof was not caused by blasting, a concern Wehrman stated was reported to him by the Church's members, but was caused by improper construction.
After considering the evidence presented by the Church, we conclude that the Church failed to present substantial evidence showing that the collapse of the roof on its building was a result of any one of the enumerated causes contained in the policy. Rather, the testimony elicited provided several possible causes for the collapse, but substantial evidence as to any one cause was not presented. Further, the testimony of Preston Walker and Hugh Walker bolster this conclusion because their statements concerning their beliefs as to the specific cause of the collapse were speculative. Therefore, their testimony does not rise to the level of substantial evidence, McGinnis v. Jim Walter Homes, Inc., supra, and the trial court erred when it denied State Farm's motions for a judgment as a matter of law. The trial court's judgment is therefore reversed and the cause is remanded for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
HOUSTON, SEE, LYONS, BROWN, JOHNSTONE, WOODALL, and STUART, JJ., concur.
MOORE, C.J., dissents.
MOORE, Chief Justice (dissenting).
I respectfully dissent. I would affirm the trial court's denial of State Farm's renewed motion for a judgment as a matter of law because I believe Shady Grove Baptist Church presented substantial evidence to submit to a jury the issue whether the collapse of the church building's roof was a result of any of the causes covered by the Church's insurance policy with State Farm.
At trial, the Church presented the following evidence, from which a jury could have resolved the dispute in the Church's favor. Preston Walker, a former trustee, deacon, and pastor of the Church, testified that at his home in Sipsey, one block from the church, he "could kind of feel a rumble sometimes" from blasting activity at strip mines in the area. In his deposition, admitted into evidence at trial, Hugh Walker stated that one of his neighbors had experienced "cabinets and things" rattling from the blasting. Hugh Walker also stated in his deposition that he didn't know what happened to the roof: "It just fell in." But when pressed as to his opinion as to the cause of the collapse, he said, "Old and it could have been blasting and termites. *1047 It could have been anything. I don't know. I just don't know." Walker stated in his deposition what he may have told the State Farm inspector about the cause of the collapse: "I could have said blasting or something." Walker stated in his deposition that, in the past, he had seen broken rafters on other people's houses and that those people had said that the cause of the broken rafters was "coming from blasting."
Joann Lewis, the Walkers' sister and the chairman of the Church's building committee, testified at trial that blasting in Sipsey sometimes "rattled the dishes, you know, no kind of effects in my house. It was just like a rattle." Ms. Lewis responded affirmatively when she was asked whether there had been occasions at her house and at the church building where the wind and rain were heavy and where sleet and snow "piled up on the roofs" of her house and the church. Ms. Lewis also described what she and other church members observed after the collapse:
"[W]e were just looking around in it, none of us being skilled in the area but, you know, you could pick up pieces of wood or you could walk to areas where someone would say, well, those are termites, termites have eaten it, but as far as experts or skilled people knowing, we were just looking."
Harold McCain, a former member and trustee of the Church testifying for State Farm, testified on cross-examination that when he arrived at the church building after the roof had collapsed, he "was told it was done through blasting, that through a mining company doing blasting was the first thing I heard." After the collapse, McCain was told what others thought had caused the collapse: "I was told it was due to blasting, and I pursued it in the sense of blasting, so I didn't feel that the insurance company [had any] liability to take care of it if it was a blasting company that caused the problem."
Joel Wehrman, an engineer employed by JADE Engineering sent by State Farm to inspect the collapsed church building, testified that when he went to see the church building after the collapse, "that's when I learned that many of the people there believed that the blasting from a coal mine had caused or contributed to the damage." More specifically, Wehrman stated that "the only thing anyone ever told me was there was a coal mine, I believe, it was south of the building and that there was some vibrations in the area, that several people felt had caused the collapse."
Such evidence would beand was weighed by the jury, but I believe the majority errs in holding that the evidence is not substantial and therefore not sufficient to present to a jury the issue whether the collapse of the roof was covered by the Church's insurance policy.
NOTES
[1] We note that the Church makes no argument that the policy is ambiguous.
[2] See, e.g., Paula B. Tarr et al., Insurance Coverage for Collapse Claims: Evolving Standards and Legal Theories, 35 Tort & Ins. L.J. 57, 59 (1999):

"In response to [some courts'] application of the concurrent causation theory, property insurance form writers made a number of changes in standard forms. One of those changes was to exclude collapse as a covered cause of loss except as provided in an `additional' or `extended' coverage. Coverage was provided only if the collapse was caused by certain enumerated perils. In this sense, collapse was not a peril but rather a result of other perils. The clear intent seemed to be to provide collapse coverage only if the cause or causes of the collapse were among those listed...."