Roderick Alexander sued State Farm Mutual Automobile Insurance Company and Reggie Whitaker, alleging fraud. At the close of the evidence, State Farm and Whitaker moved for a judgment as a matter of law; the trial court denied the motion. The jury returned a verdict in favor of Alexander in the amount of $200,000. State Farm and Whitaker then again moved for a judgment as a matter of law or, in the alternative, for a new trial. The trial court denied the motion; State Farm and Whitaker appeal. We reverse and remand.
 Facts
On October 18, 2000, Crystal Sellers and Roderick Alexander were involved in a two-vehicle automobile accident. Sellers, *Page 268 
who was 16 years old at the time of the accident, was driving a 1997 Mazda Protege automobile owned by her parents and insured by State Farm. Sellers was covered under the State Farm insurance policy, which was issued to her parents. Sellers testified that she presented the State Farm insurance card to one of the officers at the scene. The accident report indicates that Sellers was a minor and that the automobile she was driving was insured by State Farm.
The testimony established that State Farm investigated the accident and interviewed Alexander. State Farm determined that it could not establish whether Sellers or Alexander was liable for the accident, and it notified Alexander that because it could not determine liability, State Farm would cover the damage to Sellers's vehicle and Alexander would need to pursue coverage for damage to his vehicle and person from his insurance carrier. State Farm declared Sellers's automobile a total loss, paid Sellers's parents the fair market value of the automobile, and closed its file on the accident in May 2001.
During the summer of 2001, Alexander retained Michael Gedgoudas, an attorney, to pursue potential recovery for the damage he had sustained in the accident. According to Alexander, Gedgoudas informed him that based on his investigation Sellers did not have any insurance coverage; therefore, he was going to pursue an uninsured-motorist claim with Alexander's insurance carrier, Alfa Mutual Insurance Company. Alexander stated that he relied on Gedgoudas to communicate with the insurance companies and to pursue the best legal theories for recovery.
The record establishes that Gedgoudas represented to Alfa that Sellers had no insurance coverage at the time of the accident and, therefore, teat Alexander was pursuing an uninsured-motorist claim on his policy with Alfa. Alfa paid Alexander the full amount of his uninsured-motorist coverage — $20,000.
Alexander testified that after Gedgoudas informed him that he had received his policy limits from Alfa, he and Gedgoudas discussed, because Alexander lived with his grandparents, a possible uninsured-motorist claim on his grandparents' automobile insurance policy with Farmer's Insurance Company. After an attempt to negotiate a settlement with Farmer's Insurance, Gedgoudas sued Farmer's Insurance, seeking uninsured-motorist benefits for Alexander under his grandparents' policy.[1]
At a pretrial hearing, Farmer's Insurance, relying on the accident report, told the trial court that Sellers may have been insured by State Farm at the time of the accident. The trial court ordered Alexander and Farmer's Insurance to investigate whether Sellers in fact was an uninsured motorist at the time of the accident. Gedgoudas contacted Maceo Hall, a State Farm claims team manager, who informed Gedgoudas that he could find no evidence indicating that State Farm insured Sellers or the vehicle she was driving at the time of the accident. Hall sent Gedgoudas a letter, stating: "We researched our records and found no evidence that we insured Ms. Sellers or the 1997 Mazda during the time of the accident. Further we found no evidence that we insure either at present time."
Farmer's Insurance's investigation, however, discovered that Sellers was covered by a State Farm policy at the time of the *Page 269 
accident. Mike Sharp, also a State Farm claims team manager, sent Farmer's Insurance a certificate of insurance, which indicated that State Farm, through a policy issued to Sellers's parents, insured Sellers and the automobile she was driving on the date of the accident.
Gedgoudas then amended the complaint against Farmer's Insurance to add as defendants State Farm and Reggie Whitaker, the State Farm agent Gedgoudas's secretary/paralegal had allegedly contacted about whether Sellers had been covered under a State Farm insurance policy at the time of the accident. The complaint alleged that the conduct of State Farm and Whitaker
 "constitute[d] legal fraud in that the representation made by the defendant were misrepresentations of material facts made willfully to deceive and/or misrepresentations of material fact made recklessly or by mistake which were acted upon by [Alexander]."
Farmer's Insurance was dismissed by stipulation. Alexander's case against State Farm and Whitaker proceeded to trial; because Gedgoudas would be a witness at trial, Alexander was represented in the litigation by Nat Bryan.
At the trial, Gedgoudas testified that in 2001, when Alexander retained him, he was a sole practitioner and that Tina Rodgers was employed as his secretary/paralegal. Gedgoudas explained his standard operating procedures for pursuing a personal-injury case and in particular his investigation of Alexander's case. The following testimony was elicited:
 "[Alexander's counsel]: Had you trained Ms. Rodgers, your paralegal and secretary, in certain procedures you expected her to follow when you took in a new file?
 "[Gedgoudas]: Absolutely.
 "[Alexander's counsel]: And tell the ladies and gentlemen of the jury the procedures that you had taught her to follow.
 "[Gedgoudas]: Basically, it kind of runs the gamut from opening a file from the very beginning of the client coming in the office. That's getting the file set up in the way I had my files set up with regard to medical authorization, personal information, things of that nature. All of that is just a standard procedure that's going to happen in every case regardless of the matter that's involved.
 "If you're asking specifically with respect to an accident case, or with respect to any case like Mr. Alexander's, essentially the first thing she has to do is get a letter out to the client. After they come in, we talk at length about what the process is going to be like, what to expect, how long it may or may not take and just the general procedures. . . . She's also instructed to confirm coverage with regard to the at-fault party. If there is no coverage from the at-fault party, we proceed to coverage with — or a possible [uninsured- or underinsured-motorist] claim.
 ". . . .
 "[Gedgoudas]: . . . So her first thing to do would be to get the follow-up and get letters of representation, things of that nature.
 "[Alexander's counsel]: Would you also have obtained a copy of the Alabama Uniform Traffic Accident Report?
 "[Gedgoudas]: If [the client] didn't bring it with him, we would have gotten it immediately.
 ". . . .
 "[Alexander's counsel]: And the accident report gives you a lot of data about what happened on the day of the accident and identifying information about the other driver? *Page 270 
 "[Gedgoudas]: Yes, sir.
 "[Alexander's counsel]: All right. Now, as far as you recall from her working with you, did Ms. Rodgers follow that procedure?
 "[Gedgoudas]: As far as I recall, she did.
 "[Alexander's counsel]: And did you have any problems with her not following the procedure and following your instructions about not contacting the insurance company or confirming whether there is coverage?
 "[Gedgoudas]: No. I was pleased with her performance on the job and when she left I gave her a good recommendation.
 "[Alexander's counsel]: Okay. Let's talk about [Alexander's] case specifically. And I have already — the jury will already have in evidence some notes [from your file], and I want to make sure that you recognize these as well. . . .
 ". . . .
 "[Alexander's counsel]: And was that a typical type of thing that she would do was to note and record information she obtained in doing her job?
 "[Gedgoudas]: Sure.
 "[Alexander's counsel]: And would she put that either on the file or in the front cover of the file usually?
 "[Gedgoudas]: Usually it would be — that's kind of the way we would communicate back and forth until a letter would go out. I would put some sort of sticky note on the top of the file, on the outside of the file, give it to her. And likewise in all likelihood, this would be on top of the file.
 ". . . .
 "[Alexander's counsel]: That note reflects that it was — it was taken or written on 07/27/01?[2]
 "[Gedgoudas]: That's correct.
 ". . . .
 That's correct.
 "[Alexander's counsel]: Now, let me show you [another note]. That is also a smaller `Post-it Note,'[3]
correct?[4]
 "[Gedgoudas]: Correct.
 "[Alexander's counsel]: And that has some of your writing she identified and some of hers?
 "[Gedgoudas]: Everything in black is [Rodgers's] and everything in blue is mine.
 "[Alexander's counsel]: All right. And what did you tell — are you giving her messages like a lot of us do to other workers when you wrote that?
 "[Gedgoudas]: Yes.
 "[Alexander's counsel]: What was the message you were giving to her?
 "[Gedgoudas]: I'm telling her to send to State Farm a letter of representation and to reference their insured. *Page 271 
 "[Alexander's counsel]: Okay. And what is under that?
 "[Gedgoudas]: Sent, mean right here?
 "[Alexander's counsel]: Right.
 "[Gedgoudas]: That just says send, with an arrow pointing up, and I'm just instructing her to go ahead and send it.
 "[Alexander's counsel]: All right, and she's got `Nettie' and `Reggie' with a fax number and a phone number, correct?
 "[Gedgoudas]: Correct.
 "[Alexander's counsel]: All right. Do you remember as we sit here today anything happening about any communications you had with [Rodgers] before a fax cover sheet and possible accident report was sent to Mr. Whitaker"s agency and [Alexander's] file?
 "[Gedgoudas]: Do I remember specifically any conversations with Tina?
 [Alexander's counsel]: Yeah, before a fax cover sheet was sent?
 "[Gedgoudas]: Well, I mean, I would have told her to call State Farm to get coverage. I want to say, and I'm not sure, but I want to say that this was the first thing that came back to me.
 "[Alexander's counsel]: When you say this, you're talking about —
 "[Gedgoudas]: [The note dated July 27, 2001,] was the first thing that came back to. me as the best that I recall and that she had been told —
 ". . . .
 "[Alexander's counsel]: . . . On 09/07 or 09/10/01 that is a fax to Reggie Whitaker's office, correct, based on what you know now?
 "[Gedgoudas]: Correct.
 "[Alexander's counsel]: And is that pursuant, as far as you can tell, to your instruction for her to send the letter of representation to State Farm?
 "[Gedgoudas]: Correct. . . .
 "[Alexander's counsel]: Where you instructed her to do that, correct?
 "[Gedgoudas]: Correct.
 "[Alexander's counsel]: And is the reason that you do that so that the insurance company that is insuring the wrongdoer or the at-fault party knows of your representation and knows to deal with you regarding any aspect of that claim?
 "[Gedgoudas]: Absolutely. They should have — once we get our representation letter out, they know not to contact the client [in] any way, that everything has to go through our office. So at that point we had obviously determined that Nettie — I don't know who Nettie is, but Nettie is the person directed to send the letter to and the fax. I know that the fax contained the cover sheet and the accident report.
 ". . . .
 "[Alexander's counsel]: That fax goes out. According to [Rodgers], it's confirmed that it went through at 9:22 a.m.
 "Okay. Let me show you Exhibit No. 4. And do you recall that document?
 "[Gedgoudas]: Yes.
 "[Alexander's counsel]: What is it?
 "[Gedgoudas]: This is a fax to Mike Lovelady at Alfa that was sent out on the same day approximately six hours later.
 "[Alexander's counsel]: Okay. Now, between when the fax that went to Nettie Barnes and when you faxed the letter to Mike [Lovelady], during that six-hour period, do you remember Tina Rodgers coming to you and having a conversation about whether there was coverage on Crystal Sellers?
 ". . . .
 "[Gedgoudas]: I was provided information with respect to coverage.
 ". . . . *Page 272 
 "[Alexander's counsel]: Well, do you recall having a conversation with [Rodgers]?
 "[Gedgoudas]: I do.
 "[Alexander's counsel]: And [Rodgers] is your secretary, right?
 "[Gedgoudas]: She is.
 "[Alexander's counsel]: And lawyers and secretaries and people that work and their co-employees or coworkers do things for them. They have conversations all the time, right?
 "[Gedgoudas]: Constantly.
 "[Alexander's counsel]: And you would ask her to do a specific task which was to contact State Farm and to fax a letter of representation, right?
 "[Gedgoudas]: Which is what I did.
 "[Alexander's counsel]: Which is what she did, she sent a letter saying y'all need to send a letter of representation, correct?
 "[Gedgoudas]: Correct.
 "[Alexander's counsel]: And was a letter of representation ever sent to State Farm?
 "[Gedgoudas]: No.
 "[Alexander's counsel]: All right. And what did you do after this conversation you had with [Rodgers]?
 "[Gedgoudas]: After the conversation with [Rodgers], I instructed her to send a rep[resentation] letter to Mike Lovelady in Montgomery with Alfa, which was [Alexander's underinsured/uninsured-motorist] carrier.
 "[Alexander's counsel]: And what was the purpose for sending Alfa a letter on the same day that you faxed one to State Farm and not send one to State Farm?
 "[Gedgoudas]: I sent one to Alfa because we had [an uninsured-motorist] claim to provide at the time. I did not send one to State Farm because we were informed there was no coverage.
 ". . . .
 "[Alexander's counsel]: If there had been coverage, if you had been provided information there was coverage through State Farm Mutual Automobile Insurance Company on Crystal Sellers, would you have sent a letter of representation to State Farm?
 "[Gedgoudas]: To State Farm I would have.
 "[Alexander's counsel]: Sure.
 "[Gedgoudas]: I would not have sent one to Alfa.
 ". . . .
 "[Gedgoudas]: And the question was assuming that I had been provided with information that there was no coverage?
 "[Alexander's counsel]: Right.
 "[Gedgoudas]: I would not have sent a letter to State Farm, a rep[resentation] letter. Once I'm told there is no coverage with them, it would be pointless for me to send a rep[resentation] letter.
 "[Alexander's counsel]: All right.
 "[Gedgoudas]: I would send a [representation] letter to Alfa.
 ". . . .
 "[Alexander's counsel]: Is there any reason to send a letter to an insurance company if you are "provided information they don't insure the wrongdoer?
 "[Gedgoudas]: It would be a complete waste of time.
 ". . . .
 "[Alexander's counsel]: And if you write letters saying to Alfa `I've confirmed there's not coverage' when you have it, and in your judgment would that affect your credibility?
 "[Gedgoudas]: I'm not going to stick my neck out on the line like that, not for any one claim or any group of claims. *Page 273 
 This — I've known [the Alfa claims representative] forever. And I told him what I knew to be true. We proceeded with the [uninsured-motorist] claim from that standpoint. I went on and told the same thing to Farmer's. I told the same thing to Judge Boohaker when we were up here on the subsequent hearing. I told everybody that I dealt with in this case that there was not coverage through State Farm.
 "[Alexander's counsel]: All right. We'll come to some of those in a moment. But specifically just with Alfa, if you had written a letter and you did not have satisfactory confirmation to you that there was not coverage on Crystal Sellers and you wrote a letter saying `I have confirmed there's no coverage,' do you believe that would affect your ability to deal with them in the future?
 "[Gedgoudas]: Oh, certainly.
 "[Alexander's counsel]: And would you have ever written a letter like that to [the Alfa claims representative] or to Farmer's Insurance Company, if you did not have information you believed was reliable?
 "[Gedgoudas]: No, no."
Rodgers also testified about office procedures and the investigation of Alexander's case. She explained that while she worked for Gedgoudas she frequently used "Post-it" notes to communicate with Gedgoudas or to remind herself about a case. When questioned about the note dated July 27, 2001, Rodgers stated that the note indicated that she "called State Farm about Crystal Sellers. That [she] spoke to somebody. There was no policy on the vehicle. And the person [she] spoke to would have been Reggie Whitaker at that [telephone] number" on the note. Rodgers testified that she did not specifically remember the conversation with Whitaker, but that the note refreshed her recollection that she had made a telephone call to him and had recorded the contents of the conversation by a handwritten note.
Rodgers also identified the other "Post-it" note found in Alexander's file. According to Rodgers, both she and Gedgoudas had written on that note. She testified that the note indicated that Gedgoudas wanted her to send a representation letter to State Farm, referencing Crystal Sellers. She further explained that she had written "Nettie," "Reggie," and a telephone number, and then a facsimile transmission telephone number on the note. She testified that her actions and notes indicated that she had talked with Nettie Barnes,[5] that she learned that Reggie Whitaker[6] was the State Farm contact, and that she could fax the letter to him at that number. Rodgers testified that on September 10, 2001, she sent a fax dated September 7, 2001, to State Farm indicating that Gedgoudas wanted to know to whom to send his letter of representation. She testified that she included in the fax a copy of the accident report relating to Alexander and Sellers's accident, which included Sellers's name, driver's license number, date of birth, address, Social Security number, and the location of the accident for State Farm to determine if it had insured Sellers *Page 274 
on the date of the accident. Rodgers further testified that she confirmed that the fax was received. She stated that she did not remember having a conversation with either Barnes or Whitaker or anybody from State Farm after she sent the fax. She stated that she did not fax a letter of representation to State Farm.
Rodgers testified that approximately six hours later, at Gedgoudas's instruction, she sent a fax to Mike Lovelady at Alfa. The fax to Alfa included a letter of representation, indicating that Gedgoudas was representing Alexander and that Alexander was making an uninsured-motorist claim on his policy with Alfa. Rodgers testified that she would not have sent the letter to Alfa without first having learned that Sellers was not covered by a State Farm policy on the date of the accident. The following testimony was elicited:
 "[Alexander's counsel]: You answered the question earlier that there was only one other case like this that you remember and what did you mean by that, Ms. Rodgers?
 "[Rodgers]: When I had called and I was told that there was no insurance or coverage on the person, that the insurance company didn't have any name or list any of these people. And so when — after that I told Mike [Gedgoudas] about that, and he handled it.
 "[Alexander's counsel]: Do you have that specific memory that this is only one of two occasions where you were provided that information?
 "[Rodgers]: Yes.
 "[Alexander's counsel]: As far as you know from looking at the records that I've shown you, and you've seen those, of course, before today, when you met with [State Farm's counsel], correct?
 "[Rodgers]: Yes, sir.
 "[Alexander's counsel]: Did you speak with Mr. Whitaker on July 27, 2001, when you made that Post-it note from what you recorded?
 "[Rodgers]: Yes, I would have.
 "[Alexander's counsel]: At least you got Nettie's name somehow because that's who you addressed the fax to and her name is included on the Post-it note, correct?
 "[Rodgers]: Yes.
 "[Alexander's counsel]: Is there any need — were you trained that there was any need to send the letter of representation to an insurance company if you were told and advised that that insurance company does not insure the particular person you're calling about?
 "[Rodgers]: No, I wouldn't have sent a letter.
 "[Alexander's counsel]: It would have been useless, wouldn't it?
 "[Rodgers]: Yes, sir.
 "[Alexander's counsel]: If you received information that the insurance company that you contacted does not insure a particular individual, there would have been no need to send a letter of representation?
 "[Rodgers]: Correct."
At the close of Alexander's evidence and again after the jury rendered its verdict, State Farm and Whitaker moved for a judgment as a matter of law on the fraud claim, arguing, among other things, that Alexander had failed to present substantial evidence of the elements of misrepresentation. The trial court denied the motions. State Farm and Whitaker appeal.
 Standard of Review
"In Waddett Reed, Inc. v. United Investors LifeInsurance Co., 875 So.2d 1143 (Ala. 2003), this Court stated the standard of review applicable to a trial court's ruling on a motion for a judgment as a matter of law (`JML'): *Page 275 
 "`When reviewing a ruling on a motion for a JML, this Court uses the same standard the trial court used initially in deciding whether to grant or deny the motion for a JML. Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case to be submitted to the jury for a factual resolution. The nonmovant must have presented substantial evidence in order to withstand a motion for a JML. A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. . . .'
"875 So.2d at 1152 (citations omitted)." City ofCrossville v. Haynes, 925 So.2d 944, 950 (Ala. 2005). Additionally, "[a] judgment as a matter of law is proper `"`only where there is a complete absence of proof on a material issue or where there are no controverted questions of fact on which reasonable people could differ' and the moving party is entitled to [a] judgment as a matter of law."'Floyd v. Broughton, 664 So.2d 897 (Ala. 1995)."Locklear Dodge City, Inc. v. Kimbrell, 703 So.2d 303,304 (Ala. 1997).
 Issue and Analysis
State Farm and Whitaker contend that the trial court erred in denying their motions for a judgment as a matter of law because, they say, Alexander did not present substantial evidence of a misrepresentation by State Farm so as to support his claim of fraud. Specifically, State Farm and Whitaker argue that Alexander did not present substantial evidence indicating that State Farm informed Rodgers that at the time of the accident with Alexander Sellers was not covered by a State Farm insurance policy.
In order to withstand a motion for a JML on his fraudulent-misrepresentation claim, Alexander was required to present substantial evidence indicating (1) that State Farm, through Whitaker, misrepresented to him that Sellers was not covered by a State Farm policy at the time of the accident, (2) that State Farm, through Whitaker, made the misrepresentation willfully to deceive, recklessly without knowledge, or mistakenly, and (3) that he suffered damage as a proximate consequence of his reliance on State Farm's misrepresentation.Ex parte Alfa Mut. Fire Ins. Co., 742 So.2d 1237
(Ala. 1999).
It is undisputed that, at the time of the accident involving Alexander and Sellers, Sellers and the automobile she was driving were insured by State Farm under a policy issued in her parents' name. The evidence at trial relating to whether State Farm, through Whitaker, made a misrepresentation regarding whether Sellers was covered by a State Farm policy at the time of the accident was presented through the testimony of Rodgers and Gedgoudas. Rodgers testified as to her role in the investigation in Alexander's case and explained the meaning of the note dated July 27, 2001, and her actions in sending faxes to State Farm and Alfa on September 10, 2001. Rodgers's testimony regarding her communication with State Farm based on her note dated July 27, 2001, does not establish that State Farm informed her that there was not in effect an insurance policy on Sellers and her automobile on the date of the accident. The note dated July 27, 2001, at most establishes that Rodgers asked whether Sellers was covered by an insurance *Page 276 
policy. A statement by State Farm in response indicating that there was no coverage on July 27, 2001, would be true, because the insured automobile had been totaled, State Farm had closed its file on the accident, and no policy had ever been issued in Crystal Sellers's name as opposed to her parents. Rodgers specifically stated that she had no memory of what discussions she actually had had with State Farm on July 27, 2001, and her testimony based on her notes simply does not establish that State Farm represented to her during that conversation that on the date of the accident, October 18, 2000, Sellers was not covered by a State Farm insurance policy. Additionally, Rodgers's testimony about the fax she sent State Farm on September 10, 2001, does not establish that Rodgers inquired about coverage and that State Farm made a misrepresentation to her in response to her inquiry. Rodgers's testimony about Gedgoudas's note and the fax indicate that the purpose in contacting State Farm that day was not to confirm coverage on the date of the accident, but to advise State Farm that Gedgoudas was representing Alexander and to determine to which claims representative Gedgoudas should send his letter of representation. Neither the fax cover sheet nor Rodgers's testimony about the fax indicates that she inquired as to coverage on that day. Furthermore, Rodgers does not recall a conversation with a State Farm representative after she sent the fax, nor does she recall further conversation with Gedgoudas about State Farm. Nothing in Rodgers's testimony amounts to substantial evidence indicating that State Farm made a misrepresentation to her about its coverage of Sellers or the automobile Sellers was driving on the date of the accident.
Gedgoudas's testimony likewise does not present substantial evidence of a misrepresentation by State Farm. Gedgoudas admitted at trial that he never personally had any conversations with anyone at State Farm during the July-September 2001 time frame and that he had relied on Rodgers to provide information about Sellers's coverage. Gedgoudas stated that he did not recall any conversations with Rodgers about State Farm and coverage on Sellers on July 27, 2001. Although he did recall conversations with Rodgers on September 10, 2001, his testimony consists of an assumption that a misrepresentation was made based on the fact that the fax was sent to Alfa. Nothing in his testimony establishes that Rodgers asked State Farm whether Sellers was covered by a policy on the date of the accident.
The evidence presented by Alexander of misrepresentation does not satisfy the substantial-evidence test. "[S]ubstantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." Westv. Founders Life Assurance Co. of Florida, 547 So.2d 870,871 (Ala. 1989). Substantial evidence of a misrepresentation by State Farm is not presented through the testimony concerning the July 27, 2001, note. Both Gedgoudas and Rodgers acknowledge in their testimony that if they had understood that after Rodgers's July 27, 2001, inquiry that State Farm had provided Sellers no coverage for the accident, there would have been no reason on September 10, 2001, to attempt to learn to whom at State Farm a letter of representation should be directed. Substantial evidence of a misrepresentation by State Farm on September 10, 2001, likewise is not presented, because no evidence, other than speculation and conjecture, established that an inquiry was made as to Sellers's coverage on the date of the accident. Thus, Alexander's fraud claim is essentially based on the assumption that someone from State Farm, after Rodgers *Page 277 
sent the fax inquiring to whom to send the letter of representation, had a conversation with Rodgers to say there was not coverage: This assumption rests upon the fact that six hours after Rodgers sent the fax to State Farm, she faxed a letter of representation to Alfa, Alexander's automobile-insurance carrier. Only circumstantial evidence from which various assumptions may be drawn supports Alexander's claim of misrepresentation. Such circumstantial evidence is not substantial evidence indicating that State Farm misrepresented that it did not have an automobile insurance policy covering Sellers and the automobile she was driving on the date of her accident with Alexander.
Because we conclude that Alexander has failed to present substantial evidence of a misrepresentation by State Farm to establish his claim of fraud, a judgment as a matter of law is warranted on this ground, and we pretermit discussion of the other issues presented by the parties.
 Conclusion
Alexander failed to present substantial evidence of a misrepresentation by State Farm to support his claim of fraud; therefore, we must conclude that the trial court erred in denying State Farm and Whitaker's motion for a judgment as a matter of law and that the trial court improperly submitted Alexander's fraud claim against State Farm and Whitaker to the jury. We reverse the judgment, and we remand this cause for the trial court to enter a judgment as a matter of law in favor of State Farm and Whitaker.
REVERSED AND REMANDED.
NABERS, C.J., and SEE, LYONS, HARWOOD, WOODALL, SMITH, BOLIN, and PARKER, JJ., concur.
[1] Gedgoudas also named Sellers as a defendant; she was subsequently dismissed by stipulation.
[2] The note dated July 27, 2001, was written on a small self-adhesive note in Rodgers's handwriting and contained the following list: "State Farm," "Crystal Sellers," "no policy in," "no vehicle," "Reg [Whitaker]," a telephone number, and "7/27/01." This note was admitted as plaintiff's exhibit 1.
[3] A "Post-it" note is a small sheet of paper collected into a notepad manufactured by the 3M Company. Each note is backed with a strip of repositionable adhesive and can be temporarily attached to documents, etc.
[4] This note contained writing by both Gedgoudas and Rodgers. The information written by Gedgoudas asked Rodgers to send a representation letter to State Farm referring to Crystal Sellers. The information written by Rodgers indicated the name of the person with whom she spoke at State Farm, Nettie Barnes, Barnes's telephone number, the name of the agent — Reggie Whitaker — and Whitaker's facsimile transmission telephone number.
[5] Nettie Barnes testified that she was Reggie Whitaker's office manager. She confirmed that both of the telephone numbers recorded on the note belonged to Whitaker's insurance agency. Barnes remembered receiving the fax from Gedgoudas.
[6] Whitaker testified that he is a State Farm agent and that the Sellers family was a client of his. He stated that at the time Gedgoudas allegedly sent his fax he had worked at that office for about two years. Whitaker admitted that his file indicated that he had faxed the original papers sent by the "lawyer" to the claims agent.