[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1171 
Steve Cochran appeals from the trial court's denial of his postjudgment motion for a judgment as a matter of law ("JML"), a new trial, or, in the alternative, a motion to alter, amend, or vacate a judgment entered on a jury verdict in favor of June H. Ward and her husband Conrad J. Ward.[1] We affirm.
 I. Factual Background and Proceedings Below
In January 2003, the Wards entered into a contract with A-1 Metals, Inc., for the installation of a metal roof on their house. Steve Cochran, a sales representative for A-1, negotiated the contract. During their initial meeting with Cochran, the *Page 1172 
Wards specifically inquired about the qualifications of the installers. Cochran, according to the Wards, told them that all installers of A-1 metal roofs were factory-trained and fully qualified. The first crew from A-1, headed by Dan Irving, Sr., arrived at the Wards' house on March 12, 2003, and left on March 16, 2003. The second crew, headed by Todd Johnson, arrived on April 11, 2003, and left on August 1, 2003. When the second crew left, the job was still uncompleted. During the installation process, the roof leaked at various locations of the house, causing damage to the house.
In August 2003, the Wards sued A-1 and Cochran, seeking compensatory and punitive damages for negligence, wantonness, fraudulent misrepresentation, and suppression, relating to the installation of the metal roof. The trial court entered a partial summary judgment in favor of the Wards and against A-1 on the Wards' claim that the roof was negligently installed.
The case proceeded to trial on theories of fraudulent misrepresentation and suppression against both A-1 and Cochran; a theory of wantonness against A-1; and for a determination of damages, if any, for the Wards based on A-1's negligent installation of the roof. At trial, Cochran moved for a JML at the close of the Wards' case and again at the close of all the evidence, arguing that the evidence relating to the alleged fraudulent misrepresentation was insufficient to support a verdict against him. The trial court denied both motions. The jury returned a general verdict against both A-1 and Cochran and assessed the Wards' damages at $350,000. The trial court entered a judgment against both A-1 and Cochran. Cochran filed a postjudgment motion for a JML, a new trial, or, in the alternative, a motion to alter, amend, or vacate the judgment, pursuant to Rule 59, Ala. R. Civ. P., reasserting his argument that the evidence of fraudulent misrepresentation was insufficient to support a verdict against him. Following a hearing, the trial court denied this motion. Cochran appealed.
 II. Sufficiency of Evidence of Misrepresentation
Cochran first contends that he is entitled to a JML because, he says, the Wards failed to present sufficient evidence indicating that A-1 installer Todd Johnson was not factory-trained or fully qualified to install the metal-roofing system on their house. As noted previously, Cochran had represented to the Wards that A-1 installers were factory-trained and fully qualified to install the metal-roofing system.
When reviewing a ruling on a motion for a JML, this Court uses the same standard the trial court used initially in granting or denying the motion. Palm Harbor Homes, Inc. v. Crawford,689 So.2d 3 (Ala. 1997). Regarding questions of fact, the ultimate issue is whether the nonmovant has presented sufficient evidence to allow the case or issue to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala. 1992). In an action filed after June 11, 1987, the nonmovant must present substantial evidence to withstand a motion for a JML. See § 12-21-12, Ala. Code 1975; and West v. Founders Life AssuranceCo. of Florida, 547 So.2d 870, 871 (Ala. 1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter,598 So.2d at 1353. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Id. *Page 1173 
In order to withstand a motion for a JML against their claim of fraudulent misrepresentation, the Wards were required to present substantial evidence indicating (1) that Cochran misrepresented to them that Todd Johnson was factory-trained and fully qualified to install the metal-roofing system on their house, (2) that Cochran did so willfully to deceive, recklessly without knowledge, or mistakenly, and (3) that the Wards suffered damage as a proximate consequence of their reliance on his misrepresentation. Ex parte Alfa Mut. Fire Ins. Co.,742 So.2d 1237 (Ala. 1999). In the alternative, the Wards may show that Cochran's failure to disclose, or suppression of, a material fact, rather than an affirmative misrepresentation, induced the reliance and proximately caused their damage. Id.
The evidence at trial relating to whether Todd Johnson was factory-trained or fully qualified to install the metal roof was conflicting. Classic Products, Inc., manufactured the metal shingles used on the Wards' house; it also provided its suppliers, including A-1, with hands-on training in installing the shingles. At trial, the Wards presented the deposition testimony of Todd Eugene Miller, the president of Classic Products, as well as Jeffery Mescher, the installation-training technician for Classic Products.
The jury heard the following deposition testimony of Miller:
 "Q. Okay. Has Classic [Products] ever, at any time, provided any training to Dan Irving, Sr.?
 "A. Yes. Dan Irving was present for a training session we ran in New Orleans once upon a time.
 ". . . .
 "Q. Okay. Has Classic [Products] ever provided any training to Todd Johnson?
 "A. Not to our knowledge."
(Emphasis added.)
The jury heard also heard the following deposition testimony of Mescher:
 "Q. How many people have you trained on the installation of Classic's products, any judgment?
 "A. Probably anywhere from 250 to 350 I would suspect.
 "Q. And is that a hands-on type of training?
 "A. Yes, it is.
 "Q. Where the product is actually installed?
 "A. Correct.
 ". . . .
 "Q. How many different states — or what different states have you given training in?
 "A. All of them except for four in the United — in the 50.
 "Q. So you've given training in 46 states?
 "A. Yes, sir.
 "Q. Now, when customers have complaints or questions about a Classic [Products] roofing system, do you sometimes go inspect that out in the field?
 "A. I have in the past, yes.
 ". . . .
 "Q. Now, have you been to the home of Conrad Ward and June Ward in Elmore County?
 "A. Yes.
 ". . . .
 "Q. I'm sorry. What is the date you were at the Wards' home?
 ". . . .
 "A. Right. It was May 9, 2003.
 ". . . .
 "Q. And did you find any problems in the installation?
 "A. Well, there were some things that — that were brought to my attention *Page 1174 
as far as being considered not necessarily good roofing practice.
 ". . . .
 "Q. Now, if A-1 Metals' installers had received any training from Classic [Products], would you have been the person responsible for providing that training?
 "A. Yes, I was.
 ". . . .
 "Q. All right. Now, did you ever provide any type of training to Dan Irving, Sr.?
 "A. Sometime in the past, there was a training class held in New Orleans that Dan was present at.
 ". . . .
 "Q. Have you ever provided any training to Todd Johnson?
 "A. I don't recall his name in any of the [training sessions], no, sir."
(Emphasis added.)
Cochran, on the other hand, argues that Todd Johnson was factory-trained and fully qualified to install the roof. Herman Cline, the president of A-1 when the metal roof was installed on the Wards' house, testified that Todd Johnson was trained by Jeffery Mescher of Classic Products over a two-day period in Odenville, Alabama. Cline testified as follows:
 "Q. You're sure [Todd Johnson] was there?
 "A. Yes.
 "Q. He is not mentioned in the report, is he?
 "A. He is not mentioned. But there are several of them that was there.
 "Q. Now, the report says that about twenty people showed up for first day and about half that many showed up the second day; is that right?
 "A. That's what it says, yes, sir.
 "Q. Were you there both days?
 "A. I was there, yes, sir.
 "Q. Both days?
 "A. Yeah.
 "Q. Todd Johnson, was he one of the ones that came the first day but not the second day?
 ". . . .
 "A. As far as I remember, he was there both days.
 "Q. You're sure of that?
 "A. I'm not sure, but I say he was there.
 ". . . .
 "Q. You cannot say under oath that Todd Johnson had ever previously installed the type of shingle he was putting on the Ward home; is that true?
 "A. I couldn't say that because I really don't know. . . ."
(Emphasis added.)
In essence, Cline could not state for certain that Todd Johnson was present for the entire two-day training session held by Classic Products, thereby casting doubt on whether Johnson was fully qualified to install the metal roof in question. Cline also could not state with any certainty that Todd Johnson had ever installed the type of metal roof in question. Cline further stated in his affidavit that he had gone to the Wards' house on several different occasions to inspect the roof and that he did not "see any problems with the installation of the system." Mescher, on the other hand, contradicted Cline's testimony by providing extensive testimony regarding the faulty manner in which the roof had been installed. Finally, Michael Bazzell, a general contractor familiar with the metal-roofing system manufactured by Classic Products, inspected the roof and testified that the underlayment of the roof was so improperly installed that the roof could not be repaired unless it was first removed.
Viewing the evidence, as we must, in a light most favorable to the Wards as the nonmovants, Carter, 598 So.2d at 1353, this Court concludes that the Wards produced *Page 1175 
substantial evidence from which a jury could infer that Todd Johnson was not factory-trained or fully qualified to install the metal roof. The very fact that the roof was improperly installed creates a factual dispute regarding whether Todd Johnson was "fully qualified" to install it. Accordingly, the trial court did not err in submitting the case to the jury over Cochran's objection that the Wards failed to present sufficient evidence that Todd Johnson, the installer for A-1, was not factory-trained or fully qualified to install the metal-roofing system. The trial court therefore did not err in denying Cochran's motion for a JML.
 III. Form of the Verdict
Cochran next contends that the trial court committed reversible error by presenting a verdict form that, he says, precluded the jury from assessing damages based on each separate cause of action. This Court must first determine whether Cochran properly preserved this issue for our review. The trial court in this case presented the jury with three alternative verdict forms. The first verdict form allowed the jury to find in favor of the Wards and against A-1 Metals and to assess damages. The second verdict form allowed the jury to find in favor of Cochran and against the Wards on the Wards' fraud claims. The third verdict form, with which Cochran finds fault, allowed the jury to find in favor of the Wards and against both A-1 and Cochran and to assess damages based on the Wards' fraud claims. Cochran argues that the third verdict form also allowed the jury to assess damages against him based on the Wards' separate claim against A-1 alleging wantonness. The argument is without merit. The verdict form specifically states that the damages award is based on a finding of fraud, not wantonness:
 "[W]e the jury find . . . in favor of the [Wards] and against the defendants A-1 Metals and [Cochran] and assess [the Wards] damages at ___, that is if you find fraud, either innocent — fraud by misrepresentation or innocent misrepresentation on the part of [Cochran] because [Cochran] is not charged with wantonness. Only A-1 is charged with wantonness."
After the trial court presented the jury with this verdict form, the jury was excused and the following transpired:
 "[THE COURT]: What says the defendant?
 "[Counsel for Cochran]: Other than what I had just —
 "[THE COURT]: You can make your record later.
 "[Counsel for Cochran]: Yes, sir."
Other than this scant reply, Cochran made no specific objection to the use of this third verdict form, nor did he state any grounds for any objection. See Rule 51, Ala. R. Civ. P. (in order to preserve error, a party must state the matter objected to and the grounds of the objection). "[I]f an objection to a verdict form is specific enough to indicate why the party is objecting, then the issue whether the verdict form was proper is preserved for review." CP B Enters., Inc. v. Mellert, 762 So.2d 356,362 (Ala. 2000). Cochran's objection was not specific enough to indicate the basis for his objection; accordingly, we hold that Cochran failed to properly object to the use of verdict form.Id.
We further note that, during deliberations, the jury foreperson forwarded a note to the trial judge regarding the allocation of the damages award. The trial judge opened the note and read it to the attorneys. The note specifically inquired as to whether the jury should itemize the damages or assess one total amount.
The trial judge stated to the attorneys that "[m]y answer to their question will be written this way. Just one total amount —nothing to itemize, period, and my initials." (Emphasis *Page 1176 
added.) The trial judge then asked, "What says the defendant?" to which counsel for Cochran stated, "No objection." Thereafter, the jury returned a verdict in favor of the Wards and against A-1 and Cochran, and assessed damages at $350,000. The trial court entered a judgment based on the verdict. Based on the foregoing, we conclude that any argument concerning the use of the verdict form, to which Cochran failed to object, is not preserved for our review. Mellert, supra.
 IV. Excessiveness of Damages Award
Cochran lastly contends that he is entitled to a new trial because, he says, the award of punitive damages was excessive. Cochran suggests that because economic damages totaled $75,000, the verdict of $350,000 must have, by necessity, contained an element of punitive damages. The trial court in this case instructed the jury on the species of fraud for which punitive damages are recoverable, as well as the species of fraud for which punitive damages are not recoverable. The verdict form used by the jury did not specify whether the damages were compensatory damages. The language on the face of the verdict form, however, is consistent with the trial court's instruction on the species of fraud for which punitive damages are not recoverable. The verdict form specifically instructed the jury that it should find in favor of the Wards and against Cochran and A-1 — "if you findfraud, either innocent — fraud by misrepresentation or innocentmisrepresentation. . . ." (Emphasis added.) As previously noted, Cochran consented to the use of this verdict form by failing to make any specific objection to it.
Because the verdict form applicable only to legal fraud was used by the jury and because it is inconsistent with an award of punitive damages, we must conclude that the total award of $350,000 represented compensatory damages. We presume that the jury follows the trial court's instructions unless there is evidence to the contrary. Bradley v. State, 925 So.2d 232 (Ala. 2005); Wootten v. Ivey, 877 So.2d 585, 590 (Ala. 2003). A jury's verdict is presumed correct, and that presumption is strengthened by the trial court's denial of a motion for a new trial. Wal-Mart Stores, Inc. v. Goodman, 789 So.2d 166 (Ala. 2000).
We do not find any evidence to contradict the presumption that the jury followed the trial court's instruction, notwithstanding Cochran's bare contention that the verdict "of necessity" included punitive damages. At trial, the Wards presented evidence of actual damage, as well as evidence of mental anguish. As previously noted, during the installation process, the roof leaked throughout the house, causing damage to the house. Mr. Ward testified that the difference in the value of the house before and after the roof was installed was $75,000. Mrs. Ward testified that she suffered inconvenience, disappointment, and loss of sleep as a result of the improperly installed roof. She testified that she had consulted with a physician, who prescribed an antianxiety medication for her. Based on the undisputed evidence regarding economic damage of $75,000 and the evidence of mental anguish, and in light of the language on the verdict form, we reject Cochran's contention that the $350,000 award "of necessity" included punitive damages. We further note that it is not unusual for juries to award compensatory damages for mental anguish at or above the level awarded here. See OrkinExterminating Co. v. Jeter, 832 So.2d 25 (Ala. 2001); Oliver v.Towns, 770 So.2d 1059 (Ala. 2000); Delchamps v. Bryant,738 So.2d 824 (Ala. 1999); Sperau v. Ford Motor Co., 674 So.2d 24
(Ala. 1995), vacated on other grounds, 517 U.S. 1217,116 S.Ct. 1843, 134 L.Ed.2d 945 (1996), on remand, 708 So.2d 111 (Ala. 1997); Crown Life Ins. Co. v. *Page 1177 Smith, 657 So.2d 821 (Ala. 1994); and Sears, Roebuck Co. v.Harris, 630 So.2d 1018 (Ala. 1993). Because Cochran makes no argument that the damages for mental anguish are excessive, we pretermit any discussion of that issue. Based on the foregoing, the trial court did not err in denying Cochran's postjudgment motion for a JML or for a new trial.
 V. Conclusion
The trial court did not err in denying Cochran's postjudgment motions for a JML, a new trial, or, in the alternative, to alter, amend, or vacate the judgment. The judgment of the trial court is affirmed.
AFFIRMED.
NABERS, C.J., and WOODALL, SMITH, and PARKER, JJ., concur.
[1] During the pendency of this case, Mr. Ward died. June Ward, as executrix of his estate, was substituted as a party.