985 So.2d 879 (2007)
INTERNATIONAL PAPER COMPANY
v.
MADISON OSLIN, INCORPORATED.
1041299.
Supreme Court of Alabama.
November 9, 2007.
*880 Shady G. Robinson and Jarrod J. White of Cabaniss, Johnston, Gardner, Dumas & O'Neal, LLP, Mobile, for appellant.
*881 Robert H. Rutherford and F.A. Flowers III of Burr & Forman, LLP, Birmingham, for appellee.
PARKER, Justice.
International Paper Company ("IP") appeals from a judgment entered on a jury verdict in favor of Madison Oslin, Incorporated ("Madison"), in a commercial breach-of-contract case. IP seeks a judgment as a matter of law in its favor or, alternatively, a reduction of the amount of damages to be paid to Madison. We affirm in part and reverse in part.

Background and Procedural Posture
This case involves a contract for a process that produces a corrugated box that, unlike the wax-coated box IP provides, is totally recyclable and sturdy enough for everyday use. Such a box would fill a large demand and would replace the wax-coated box IP currently provides the poultry market. IP had started in late 2000 to develop a wax-free box, but it had not yet succeeded when it became aware of Madison's process. It engaged a university research lab to test the Madison-coated container, and the lab determined the coating to be "the best wax-substitute product it had ever tested...."[1] IP spent close to a year in "field trials" of the wax-free product satisfying itself of the probability of success for the product.
Madison, as the owner of rights to EvCote, a patented chemical coating manufactured by EvCo Research, L.L.C., and of the application process and the facilities required to apply the coating, entered into a contract with IP pursuant to which Madison would apply the coating exclusively to IP products used for corrugated containers for red meat and poultry products, i.e., MAP containers,[2] thereby giving IP exclusive control of the wax-free process. This exclusivity geographically included the United States, Canada, and Mexico, and was conditioned on IP producing a volume of materials to be coated at a rate of no less than 75,000 thousand square feet ("msf") per month by June 1, 2002. The term of the original contract was from January 1, 2002, to December 31, 2002. Extensions for succeeding one-year periods were to be automatic unless notice of termination of the contract was provided to the other party at least six months before the end of the current term. Pricing ranged from $6.00/msf to $6.75/msf depending on the volume IP provided for coating and was subject to renegotiation if IP did not meet and maintain the minimum 75,000 msf per month volume requirements. IP's brief, Exhibit A.
The contract designated Tennessee law as controlling. Neither party objected when the case was tried in Alabama, and the trial court applied Alabama law.
The contract was the result of months of negotiations; several drafts were considered before the final contract was signed. For months before and during those negotiations, Madison and an IP project team were involved in cooperative feasibility studies evaluating Madison's process. It was only after IP had concrete evidence that Madison's process provided a wax-free substitute that cost less to produce, that was environmentally friendly, and that performed as well or *882 better than IP's existing product, that IP became serious about negotiating with Madison. The feasibility studies led IP to believe that Madison's coating process produced a cost-competitive container with performance attributes comparable to IP's waxed container. Because Madison had the exclusive rights to the coating that IP thought would best meet the needs of the ultimate users of the containers, IP entered into the contract with Madison.
For its part, Madison had worked with other potential customers. It had in fact coated materials for another customer sufficient to produce 10,000,000 cartons for a single poultry processor, demonstrating the existence of a market beyond the market provided by IP.
Once the contract between IP and Madison was in place, IP never met its commitment for the minimum volume established in the contract. Madison established at trial that IP had produced less than one percent of the contractually required volume from the effective date of the contract on January 1, 2002, until March 18, 2003, the date Madison brought its breach-of-contract and fraud action against IP and three individuals[3] in the Jefferson Circuit Court. The complaint also alleged various related torts, some of which were dismissed by the trial court on December 13, 2004. The case went to trial on January 10, 2005, on three counts: one breach-of-contract count and two fraud counts.
The trial lasted nearly three weeks; more than a dozen witnesses testified. On January 28, 2005, after two days of deliberations, the jury returned a verdict for Madison in the amount of $8,900,000 on the breach-of-contract claim and a verdict for IP on the fraud counts. On February 25, 2005, IP filed a posttrial motion for a judgment as a matter of law ("JML") on the breach-of-contract claim or, alternatively, for a reduction of the jury verdict to an amount equal to net profit lost under the contract between IP and Madison. Madison also filed a motion for a new trial on February 28, 2005, on the fraud claims. The trial court denied both posttrial motions by order dated April 12, 2005. IP filed its notice of appeal on May 23, 2005, and Madison cross-appealed on June 1, 2005. Madison filed a motion to dismiss its cross-appeal on May 31, 2006, and the cross-appeal was dismissed on June 15, 2006 (No. 1041340). IP raises four issues on appeal:
1. Whether IP was entitled to a JML on Madison's breach-of-contract claim.
2. Whether the damages awarded by the jury on the breach-of-contract claim, which were based upon gross revenue rather than net profit lost, were recoverable as a matter of law.
3. Whether Madison's actual operating experience, rather than projections, should be used in determining the cost of performance under the contract in order to calculate Madison's net profit lost under the contract.
4. Whether there is substantial evidence supporting the award of damages under the contract for the periods after March 2003, given Madison's alleged anticipatory repudiation of the contract by its allegedly unilateral decision to suspend coating operations.

Legal Analysis
IP asks this Court to overturn a judgment based on a jury verdict.
"No ground for reversal of a judgment is more carefully scrutinized or *883 rigidly limited than the ground that the verdict of the jury was against the great weight of the evidence. Rather, there is a strong presumption of correctness of a jury verdict in Alabama, and that presumption is strengthened by the trial court's denial of a motion for a new trial. An appellate court must review the tendencies of the evidence most favorably to the prevailing party and indulge such inferences as the jury was free to draw. The reviewing court will not reverse a judgment based on a jury verdict unless the evidence is so preponderant against the verdict as to clearly indicate that it was plainly and palpably wrong and unjust."
Christiansen v. Hall, 567 So.2d 1338, 1341 (Ala.1990) (citations omitted). Accordingly, in considering the evidence we must indulge a presumption of correctness of the verdict for Madison, and we must indulge any inferences the jury may have drawn in considering such evidence.

Motion for a JML
The trial court denied IP's postjudgment motion for a JML, in which IP claimed that the contract was not ambiguous and that there was insufficient evidence indicating that IP had breached the contract. The trial court found the contract to be ambiguous when it evaluated Madison's and IP's pretrial motions for a summary judgment. The trial court issued its order holding that the contract was ambiguous on November 2, 2004. IP argues that its failure to provide the volume of paperboard for coating that was agreed to in the contract was not a breach of the contract because, it argued, provision had been made in the contract for the eventuality that IP might not provide that volume. One such provision, section 3, established graduated pricing at lower volumes than the minimum monthly volume promised in section 2.[4] The other section, section 1.2, bases IP's right to exclusivity on IP's meeting the volume requirements specified in section 2. IP argues that the three sections  1.2, 2, and 3  taken together unambiguously construct a contract that permitted IP to provide less than the minimum volume to Madison without breaching the contract. Madison argues that "[i]f the trial court determines that a contract `is ambiguous or uncertain in any respect, it becomes a question for the fact-finder to determine the true meaning of the contract.' Ex parte Harris, 837 So.2d [283, 290 (Ala.2002)]." Madison's brief at 28. The trial court determined that the contract was ambiguous, and it referred the breach-of-contract claim to the jury. It is from this decision that IP appeals.
"`"`A judgment as a matter of law is proper only where there is a complete absence of proof on a material issue or where there are no controverted questions of fact on which reasonable people could differ and the moving party is entitled to a judgment as a matter of law.'" Southern Energy Homes, Inc. v. Washington, 774 So.2d 505, 510-11 (Ala. 2000), quoting Locklear Dodge City, Inc. v. Kimbrell, 703 So.2d 303, 304 (Ala. 1997). In reviewing the denial of a motion for a judgment as a matter of law, this Court is required to view the evidence in a light most favorable to the nonmovant. Kmart Corp. v. Kyles, 723 So.2d 572, 573 (Ala.1998).'"
Wood v. Phillips, 849 So.2d 951, 957 (Ala. 2002) (quoting Liberty Nat'l Life Ins. Co. v. Daugherty, 840 So.2d 152, 156 (Ala. 2002)). See also Cochran v. Ward, 935 So.2d 1169 (Ala.2006); Thompson Props. 119 AA 370, Ltd. v. Birmingham Hide & *884 Tallow, 897 So.2d 248 (Ala.2004); and Alabama Dep't of Transp. v. Land Energy, Ltd., 886 So.2d 787 (Ala.2004). The nonmovant in this case is Madison. As discussed below, we conclude that the trial court did not err in denying IP's motion for a JML.
The contract, which the parties executed after extensive negotiations, addresses volume in three different sections. Section 1.2 of the contract, entitled "Territory, Uses and Restrictions," provides, in pertinent part:
"The exclusive rights and privileges granted to International Paper by Madison Oslin within the Territory shall be for paper and paperboard materials for the manufacture of corrugated containers used for the red meat and poultry products described below.... Such exclusivity shall be conditioned upon International Paper meeting the quantity volume requirements contained in Section 2 below for the coating of its paper and paperboard materials. In the event the quantity volume requirements are not met by the first anniversary date of this Agreement, the parties will negotiate in good faith as to exclusivity and pricing...."
Section 2 of the contract, entitled "Volume Requirements," provides, in pertinent part:
"International Paper agrees to begin providing Madison Oslin with paper and paperboard materials onto which to apply EvCote coatings (as herein described) as soon as possible after the commencement date described in Section 14 hereof. International Paper's monthly requirement for Madison Oslin's application of these coatings on its materials shall reach a level of no less than 75,000 msf of its paper and paperboard materials on or before June 1, 2002, which minimum level shall be maintained by International Paper for the remainder of the term of this Agreement as described in Section 14 herein."
Section 3 of the contract, entitled "Price," provides:
"The price to be paid to Madison Oslin by International Paper for the monthly volume of application described in Section 2 above shall be:
"$6.75 per msf for MAP bodies if total monthly volume is between 0 and 25,000 msf;
"$6.50 per msf for MAP bodies if total monthly volume is between 25,001 and 50,000 msf;
"$6.25 per msf for MAP bodies if total monthly volume is between 50,001 and 75,000 msf;
"$6.00 per msf for MAP bodies if total monthly volume is in excess of 75,000 msf; and
"$5.75 per msf for lid stock for all lid stock orders;
"provided, however, that such prices shall be renegotiated between the parties in the event that International Paper does not meet or exceed the volume requirements contained in Section 2 herein."
In its postjudgment motion of February 25, 2005, and in this appeal, IP again argues that the contract did not require it to provide Madison with a minimum volume each month. IP argues that it "is entitled to a judgment as a matter of law on Madison Oslin's claim of breach of contract" because the "contract is unambiguous and by its plain terms does not require [it] to pay for uncoated volumes." IP's brief at 25.
"A patent ambiguity is one that is apparent upon the face of the instrument, arising by reason of inconsistency or uncertainty in the language employed. See *885 McCollum v. Atkins, 912 So.2d 1146, 1148 (Ala.Civ.App.2005) (quoting Jacoway v. Brittain, 360 So.2d 306, 308 (Ala.1978))." Meyer v. Meyer, 952 So.2d 384, 391 (Ala. Civ.App.2006).
Section 1.2 deals with exclusivity. It states that "exclusivity shall be conditioned upon International Paper meeting the quantity volume requirements contained in Section 2.... In the event the quantity volume requirements are not met by the first anniversary date of this Agreement, the parties will negotiate in good faith as to exclusivity and pricing...." This section is limited by its terms to a remedy of renegotiation only for a breach occurring before the first anniversary of the contract. The first anniversary of the contract was January 1, 2003, and Madison sued on March 18, 2003, so the remedy provided by section 1.2 was not available for damages from the continuing breach incurred after January 1, 2003.
Section 2 deals with volume. It states that volume "shall reach a level of no less than 75,000 msf ... on or before June 1, 2002, which minimum level shall be maintained... for the remainder of the term of this Agreement as described in Section 14 herein." This section makes no provision for a remedy for IP's failure to meet the specified volume.
Section 3 deals with pricing for the contract, but finishes with a renegotiation clause that provides that "prices shall be renegotiated between the parties in the event that International Paper does not meet or exceed the volume requirements contained in Section 2 herein."
Section 1.2 provided for renegotiation of the exclusivity agreement and pricing in the first year of the contract if volume requirements went unmet; section 2 unequivocally requires IP to meet certain specified volume requirements; and section 3 allows for renegotiation of pricing in the event the volume requirements were not met. No provision in any section of the contract permits IP to provide a lower volume than the volume required[5] by the contract in section 2. Yet, the sections dealing with exclusivity and pricing include provisions for remedies for failures to meet the volume requirements, while no such remedy is provided in the section specifically devoted to the volume that "shall" be reached and maintained.
The contract is unclear as to whether IP's failure to achieve the volume requirements of section 2 is permissible by virtue of the price-related remedies of sections 1.2 and 3 or prohibited by the mandatory language employed in the volume provision, section 2. "A term is ambiguous only if, applying the ordinary meaning, one would conclude that the provision containing the term is `reasonably susceptible to two or more constructions.' [State Farm Fire & Casualty Co. v. Slade,] 747 So.2d [293] at 309 [(Ala.1999)]." Safeway Ins. Co. of Alabama, Inc. v. Herrera, 912 So.2d 1140, 1144 (Ala.2005). The special writings to this opinion present differing, but reasonable, constructions of the contract. Based on the uncertainty and inconsistency in the various provisions of the contract, the trial court did not err in determining that the contract was ambiguous.
Reviewing the evidence most favorably to the nonmovant, we conclude that the contract unequivocally established a minimum monthly volume and simultaneously provided remedies when that required minimum volume was not met. This inconsistent language introduced such uncertainty *886 that there was an ambiguity in the contract that could not be resolved within the four corners of the contract. We therefore hold that the trial court did not err in denying IP's motion for a JML, and we affirm its judgment for Madison on the breach-of-contract claim.

Basis for Damages
This issue of the basis for damages will encompass IP's questions 2 and 3, because both questions will be answered once the proper measure of damages for a breach of contract is determined. In this regard, the trial court charged the jury as follows:
"With regard to the damages under the breach of contract claim, [Madison] is claiming compensatory damages for breach of contract, which is that sum which would place the injured party in the same condition it would have occupied if the contract had not been breached."
Madison had presented two exhibits that calculated its damages in different ways. One, titled "Lost Contract Revenue," calculated the revenue lost to Madison because of IP's breach at $8,443,125. The other, titled "Lost Revenue," used the same revenue figure as did the first, but subtracted from it the variable costs that Madison would likely have expended in providing the coating services. It yielded a figure of $4,047.638.58. Although it was captioned "Lost Revenue," it more accurately should have been captioned "Lost Profit." It appears that the jury chose to use the higher figure in its damages award, and IP contends that that choice was improper under the law. We agree.
Had both parties fulfilled the contract for its intended duration, Madison would have received its expected amount of product for coating and, presumably, would have coated the product using its facilities, personnel, and materials, and would have experienced all the costs attendant with maintaining an ongoing operation of the nature contemplated. If the costs were less than the price it received for its services, it would have retained for its own use the residual or "profit." This profit is what is required to place the injured party in the same condition it would have occupied had the contract not been breached. "The proper measure of damages in cases such as this is the difference between the price agreed upon in the contract and the cost of performance, or, in other words, the profit." Cobbs v. Fred Burgos Constr. Co., 477 So.2d 335, 338 (Ala.1985). Tennessee law comports with this principle. See Tennessee v. Wood Group Enters., Inc., 816 S.W.2d 35, 37 (Tenn.Ct.App. 1991). This Court discussed the issue of profit recovery in a breach-of-contract situation as follows:
"The general rule is stated at 25 C.J.S. Damages § 43, as follows:
"`Under most authorities, as a general rule a party not in default is, in case of a breach of contract due to the fault or omission of the other party, entitled to recover profits which would have resulted to him from performance. In order that it may be a recoverable element of damages, the loss of profits must be the natural and proximate, or direct, result of the breach complained of and they must also be capable of ascertainment with reasonable, or sufficient, certainty, or there must be some basis on which a reasonable estimate of the amount of the profit can be made; absolute certainty is not called for or required.
"`Lost profits are recoverable only when it reasonably or definitely appears that they would have been made if the contract had been performed, and where it reasonably and definitely *887 appears that their loss necessarily followed the breach.'"
Paris v. Buckner Feed Mill, Inc., 279 Ala. 148, 149-50, 182 So.2d 880, 881 (1966).
It is in accord with this principle that IP argues that the figures used in creating the second exhibit, the one captioned "Lost Revenue," favored Madison by understating costs and therefore overstating the lost profit. Because Madison did actually coat some product for IP, it had recorded actual costs incurred, and, IP argues, these should have been used to calculate damages. IP states that the "maximum proper measure of damages recoverable for the breach of contract found by the jury is $4,378,625.79." That figure is derived from an exhibit to IP's postjudgment motion for a JML in which IP deducted from the amount Madison defined as lost revenues payments it had made to Madison under the contract. IP then argues that because Madison's costs were overstated in figuring its lost profit, Madison's actual experience in coating product for IP "results in a maximum net lost profit of $3,371,675.48." This number was derived from Madison's "Lost Revenue" exhibit, less the contract revenue it paid Madison and adjusted for the removal of costs based on Madison's actual cost accumulated during its production for IP and for others. Madison argues that IP's adjustments should not be considered on appeal because they were not introduced during the trial. Although it is true that the actual exhibits were not introduced at trial, the subject matter of IP's disagreement with Madison's methodology, figures, and recommended adjustments was introduced in lengthy testimony by David Borden, a certified public accountant and IP's expert witness.
Finally, IP argues that any damages awarded should be only for the time period before Madison ceased coating operations for IP. IP, however, in its motion for a JML stated that "[i]t was undisputed that the requisite notice to cancel was given by [IP] and that the contract terminated by its terms on December 31, 2003." Since the term of the contract continued beyond Madison's cessation of its operation, the amount of damages to be awarded to place Madison in the position it would have occupied had the contract been appropriately performed must include the time up to the termination of the contract.

Anticipatory Repudiation
IP argues that in deciding to suspend coating operations, Madison committed an anticipatory breach of contract. Madison's letter advising IP of the cessation of its operations stated, in pertinent part:
"Please let this letter serve as notice that, due to International Paper's repeated and continuing breaches of the Agreement ... Madison Oslin has been forced to suspend all operations effective immediately. In the event IP begins full and complete performance of its contractual and other obligations to [Madison], then [Madison] is prepared to make all reasonable efforts to resume operations."
"It is invariably stated in the decisions that in order to give rise to an anticipatory breach of contract, the defendant's refusal to perform must have been positive and unconditional." 23 Richard A. Lord, Williston on Contracts § 63:45 (4th ed.2002) (footnote omitted). "`... "Merely because a given act or course of conduct... is inconsistent with the contract is not sufficient; it must be inconsistent with the intention to be longer bound by it."'" Johnston v. Green Mountain, Inc., 623 So.2d 1116, 1121 (Ala.1993) (quoting Draughon's Bus. Coll. v. Battles, 35 Ala.App. 587, 590, 50 So.2d 788, 790 (1951)).
*888 The letter Madison sent to IP was not unequivocal in its notification that it was forced by IP's conduct to cease operations. Rather, it stated that should IP send work defined by the contract Madison would endeavor to provide its services pursuant to the contract. Accordingly, we hold that Madison's cessation of operations was not an anticipatory breach of the contract.

Conclusion
The trial court did not err in denying the motion for a JML, which would have set aside the jury verdict. The damages that were awarded, however, were calculated using impermissible "lost revenue" methodology. Accordingly, we reverse the judgment insofar as the damages awarded, and we remand this cause for the trial court to recalculate damages using the "lost profit" methodology discussed in this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH DIRECTIONS.
COBB, C.J., and SEE, SMITH, and BOLIN, JJ., concur in the result.
LYONS, WOODALL, STUART, and MURDOCK, JJ., dissent.
SEE, Justice (concurring in the result).
International Paper Company ("IP") and Madison Oslin, Incorporated ("Madison"), contracted for Madison to coat certain minimum volumes of IP's paper products using Madison's proprietary coating process. In exchange, Madison granted IP exclusive rights to Madison's services in coating paper products used in the packaging of meat and poultry. The contract provides that the parties would renegotiate the pricing and exclusivity terms if after June 1, 2002, IP failed to meet certain monthly volume requirements.
IP failed to meet the volume requirements, and Madison sued, alleging breach of contract. IP moved for a judgment as a matter of law against Madison. The main opinion concludes that the pricing and exclusivity terms of the contract are ambiguous, and it therefore holds that the trial court did not err in denying IP's motion for a judgment as a matter of law and affirms its judgment. The main opinion also holds that the jury applied the incorrect method to measure damages. I concur in the result the main opinion reaches; however, I write separately to explain why I believe the trial court was correct in not entering a judgment as a matter of law for IP.
Three contract provisions are relevant to determining IP's obligation to produce a particular volume of its paper products to be coated by Madison. Section 2, entitled "Volume Requirements," states:
"International Paper agrees to begin providing Madison Oslin with paper and paperboard materials onto which to apply EvCote coatings (as herein described) as soon as possible after the commencement date described in Section 14 hereof. International Paper's monthly requirement for Madison Oslin's application of these coatings on its materials shall reach a level of no less than 75,000 msf of its paper and paperboard materials on or before June 1, 2002, which minimum level shall be maintained by International Paper for the remainder of the term of this Agreement as described in Section 14 herein."
Section 3 of the contract, entitled "Price," provides:
"The price to be paid to Madison Oslin by International Paper for the monthly volume of application described in Section 2 above shall be:

*889 "$6.75 per msf for MAP bodies if total monthly volume is between 0 and 25,000 msf;
"$6.50 per msf for MAP bodies if total monthly volume is between 25,001 and 50,000 msf;
"$6.25 per msf for MAP bodies if total monthly volume is between 50,001 and 75,000 msf;
"$6.00 per msf for MAP bodies if total monthly volume is in excess of 75,000 msf; and
"$5.75 per msf for lid stock for all lid stock orders;
"provided, however, that such prices shall be renegotiated between the parties in the event that International Paper does not meet or exceed the volume requirements contained in Section 2 herein."
Finally, the contract provides in section 1.2, entitled "Territory, Uses and Restrictions," the consequences of IP's failure to meet the volume requirements:
"The exclusive rights and privileges granted to International Paper by Madison Oslin within the Territory shall be for paper and paperboard materials for the manufacture of corrugated containers used for the red meat and poultry products described below.... Such exclusivity shall be conditioned upon International Paper meeting the quantity volume requirements contained in Section 2 below for the coating of its paper and paperboard materials. In the event the quantity volume requirements are not met by the first anniversary date of this Agreement, the parties will negotiate in good faith as to exclusivity and pricing."
The resolution of this case turns on the construction of a contract. "`"[This Court] appl[ies] a de novo review to a trial court's determination of whether a contract is ambiguous and to a trial court's determination of the legal effect of an unambiguous contract term."' Young v. Pimperl, 882 So.2d 828, 830 (Ala.2003) (quoting Winkleblack v. Murphy, 811 So.2d 521, 525-26 (Ala.2001))." Harrison v. Morrow, 977 So.2d 457, 459 (Ala.2007). "`"[A]n `instrument is unambiguous if only one reasonable meaning clearly emerges.'"' Ex parte Gardner, 822 So.2d 1211, 1217 (Ala.2001) (quoting Reeves Cedarhurst Dev. Corp. v. First Amfed Corp., 607 So.2d 184, 186 (Ala.1992), quoting in turn Vainrib v. Downey, 565 So.2d 647, 648 (Ala.Civ.App.1990))." McCollough v. Regions Bank, 955 So.2d 405, 411 (Ala.2006).
I believe that the language of this requirements contract is unambiguous. The contract provides that IP's monthly requirements for Madison's coating application on its paper products "shall reach a level of no less than 75,000 msf ... on or before June 1, 2002, which minimum level shall be maintained by [IP] for the remainder of the term...." There is no provision limiting IP's obligation to meet this monthly volume requirement to the period before June 1, 2002; indeed, IP was required to meet the volume requirement only on and after June 1, 2002.[6]
The provision in section 1.2 that "exclusivity shall be conditioned upon [IP] meeting the quantity volume requirements contained in Section 2" can be reasonably read only as being for the benefit of Madison. IP and Madison agreed that Madison would use its proprietary coating process *890 to coat only those paper products used for meat and poultry packaging manufactured by IP. IP bargained for this exclusivity to create an advantage over its competitors, who would not have access to Madison's coating process. Madison, in giving up the right to sell its coating process to IP's competitors, received the promise of a certain minimum volume of business at a certain price, namely, 75,000 msf at $6.25 per msf for MAP bodies.[7] Section 1.2 provides that if IP breaches its agreement as to volume, Madison has the right to bargain for a lesser duty of exclusivity owed to IP and a greater price per coated volume. However, although exclusivity and price may have been renegotiable as to the future, the contract provides that IP's monthly requirement was to "reach a level of no less than 75,000 msf ... on or before June 1, 2002." Under these plain terms, IP had a contractual duty to reach and to maintain its requirements at that level. By failing to require 75,000 msf by June 1, 2002, IP was in breach of its contract. Therefore, I concur in the result reached by the main opinion, although I believe the opinion erroneously concludes that the contract is ambiguous and upholds on that ground the jury's finding of a breach of the contract.[8]
For IP's breach, the jury awarded damages in the amount of $8.9 million. I agree with the conclusion in the main opinion that the jury applied the incorrect measure of damages to the facts of this case. Madison argues that the verdict takes into account the business Madison lost because of the exclusivity provision in the contract. Madison asserts that it is entitled to the profits it would have realized had it been free to coat the paper products of IP's competitors. However, "[a]s a general rule, damages in a breach-of-contract action are `"that sum which would place the injured party in the same condition he would have occupied if the contract had not been breached."'" Goolesby v. Koch Farms, LLC, 955 So.2d 422, 427 (Ala.2006) (quoting Ex parte Steadman, 812 So.2d 290, 295 (Ala.2001), quoting in turn Brendle Fire Equip., Inc. v. Electronic Eng'rs, Inc., 454 So.2d 1032, 1034 (Ala.Civ.App.1984)). In this case, had *891 IP fully performed its obligations under the contract, Madison would not have been free to provide the coating to IP's competitors, because it would have been bound by the exclusivity provision of the contract. To award Madison profits from hypothetical sales to competitors in addition to the profits Madison would have made from IP had IP fully performed constitutes a windfall to Madison. The evidence established that the $8.9 million award is well above the amount Madison would have received in revenue from its bargain with IP. Madison's own exhibits show that Madison stood to make $4,047,638.58 in gross profits, including interest, from its contractual relationship with IP. Even that figure, however, fails to reflect the deduction for operating costs Madison would have incurred had IP fully performed. Madison is entitled only to damages equal to its net profits.[9] For this reason, I agree that the judgment awarding Madison $8.9 million, which exceeds Madison's net profits, must be reversed and the case remanded to the trial court for a recalculation of damages.
SMITH and BOLIN, JJ., concur.
LYONS, Justice (dissenting).
I would reverse the judgment entered on the jury verdict and remand the case with instructions to enter a judgment as a matter of law in favor of International Paper Company ("IP") because the trial court erred in concluding that the contract between IP and Madison Oslin, Incorporated, is ambiguous.
The contract, which the parties executed after extensive negotiations, addresses volume in three different sections. Section 1.2 of the contract, entitled "Territory, Uses and Restrictions," provides, in pertinent part:
"The exclusive rights and privileges granted to International Paper by Madison Oslin within the Territory shall be for paper and paperboard materials for the manufacture of corrugated containers used for the red meat and poultry products described below.... Such exclusivity shall be conditioned upon International Paper meeting the quantity volume requirements contained in Section 2 below for the coating of its paper and paperboard materials. In the event the quantity volume requirements are not met by the first anniversary date of this Agreement, the parties will negotiate in good faith as to exclusivity and pricing...."
*892 Section 2 of the contract, entitled "Volume Requirements," provides, in pertinent part:
"International Paper agrees to begin providing Madison Oslin with paper and paperboard materials onto which to apply EvCote coatings (as herein described) as soon as possible after the commencement date described in Section 14 hereof. International Paper's monthly requirement for Madison Oslin's application of these coatings on its materials shall reach a level of no less than 75,000 msf of its paper and paperboard materials on or before June 1, 2002, which minimum level shall be maintained by International Paper for the remainder of the term of this Agreement as described in Section 14 herein."
Section 3 of the contract, entitled "Price," provides:
"The price to be paid to Madison Oslin by International Paper for the monthly volume of application described in Section 2 above shall be:
"$6.75 per msf for MAP bodies if total monthly volume is between 0 and 25,000 msf;
"$6.50 per msf for MAP bodies if total monthly volume is between 25,001 and 50,000 msf;
"$6.25 per msf for MAP bodies if total monthly volume is between 50,001 and 75,000 msf;
"$6.00 per msf for MAP bodies if total monthly volume is in excess of 75,000 msf; and
"$5.75 per msf for lid stock for all lid stock orders;
"provided, however, that such prices shall be renegotiated between the parties in the event that International Paper does not meet or exceed the volume requirements contained in Section 2 herein."
If volumes were not met, the contract provided in section 1.2 that IP would lose its right to exclusivity and in sections 1.2 and 3 that IP would then renegotiate prices in good faith. Under these circumstances it cannot be said that an action for damages for breach of contract is available to Madison. By recognizing ambiguity where none existed,[10] the trial court allowed the jury to rewrite the contract and permit monetary relief to Madison, a remedy that it had effectively bargained away in the contract.
I therefore respectfully dissent.
WOODALL, J., concurs.
NOTES
[1] Madison's brief at 9. See also Madison's brief at 6 n. 3. Madison's process was the first of approximately 29 attempts by others over a 9-year period to produce a product that met the Fiber Box Association's recyclability protocol.
[2] The term "MAP" means "modified atmosphere packaging." The term is used to differentiate these containers from wet-ice packed cartons.
[3] The claims against two of the individual defendants were dismissed before trial, and the third individual defendant received a favorable verdict on the fraud counts, the only charge against him.
[4] Section 3 provided for renegotiation of the prices presented therein "in the event that [IP] does not meet or exceed the volume requirements contained in Section 2 herein."
[5] Each contract section under discussion refers to the volume quantities as "requirements."
[6] IP was not obligated to reach the minimum volume set in section 2 until June 1, 2002, but was obligated to act in good faith regarding its actual requirements. Because IP was bound to purchase only its actual requirements before June 1, 2002, the price schedule applies to what IP, in its exercise of good faith, required. Thus, section 2 and section 3 are in harmony.
[7] If the volume exceeded 75,000 msf, the price was $6.00 per msf; in addition, IP agreed to pay "$5.75 per msf for lid stock for all lid stock orders."
[8] The main opinion points out in support of its finding of ambiguity that "[t]he special writings to this opinion present differing, but reasonable, constructions of the contract." 985 So.2d at 885. It may appear cleverly persuasive of ambiguity in the contract language to point to the special writings, which both claim that the contract is unambiguous but disagree as to what the contract unambiguously says; however, a disagreement between judges as to the meaning of language does not render that language ambiguous. If it did, whenever this Court disagreed with a lower court's interpretation of statutory or other language, or whenever there was a dissent among the members of this Court as to the meaning of certain language, we would have to conclude that the language is ambiguous and to analyze the language on those terms. See Trinity Universal Ins. Co. v. Robert P. Stapp, Inc., 278 Ala. 209, 212, 177 So.2d 102, 105 (1965) ("Two of [the cases cited by the appellee] employ the rationale that the mere fact that there is a split of authority among the various jurisdictions indicates that the term `collision of the vehicle' is ambiguous.... We cannot accept this reasoning. To carry it to its logical conclusion, it would mean that every time two reasonable courts (or even two reasonable men) disagreed on the interpretation of a policy of insurance, the issue should be resolved in favor of the insured. We cannot accept such a theory."). There is, in this case, another possibility: either I or Justice Lyons may simply be wrong as to the unambiguous meaning of the contract language. However that may be, the main opinion, I remain convinced, is incorrect in finding the contract language ambiguous.
[9] In Ex parte Woodward Construction & Design, Inc., 627 So.2d 393, 394-95 (Ala. 1993), this Court held:

"`"When a plaintiff sues on a contract to recover the amount he would have received for the full performance prevented by the defendant's breach, he seeks in effect to recover as damages the profit from performance of the contract which profit defendant's breach prevented him from earning. In such a case, plaintiff has the burden of alleging and proving not only (a) what he would have received from the performance so prevented, but also (b) what such performance would have cost him (or the value to him of relief therefrom). Unless he proves both of those facts, he cannot recover as damages the profits he would have earned from full performance of the contract."'
"... The $10,000 damages award is erroneous because the award has not been adjusted for the amount Miree would have had to spend to make its work acceptable to the architect and the owner after those parties rejected Miree's work. The $10,000 award therefore constitutes pure profit for Miree; it does not represent a proportion of the contract price that has been earned."
(Quoting Whiting v. Dodd, 39 Ala.App. 80, 83, 94 So.2d 411, 414 (1957), quoting in turn Allen, Heaton & McDonald, Inc. v. Castle Farm Amusement Co., 151 Ohio St. 522, 86 N.E.2d 782, 784 (1949) (footnote and emphasis omitted).)
[10] The main opinion states: "The special writings to this opinion present differing, but reasonable, constructions of the contract." ___ So.2d at ___. Of course, had I considered the alternative construction set forth in Justice See's opinion concurring in the result to be a reasonable interpretation of an ambiguous contract, I would not have dissented.